# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SUGENTINO PERCEL, | § | |
| Petitioner, | § | |
| | § | CRIMINAL NO. H-06-89-(4) |
| vs. | § | |
| | § | CIVIL ACTION NO. H-10-1394 |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## UNITED STATES' ANSWER TO SUGENTINO PERCEL'S MOTION UNDER 28 U.S.C. § 2255, MOTION TO DISMISS, MOTION FOR SUMMARY JUDGMENT, AND BRIEF IN SUPPORT

The United States moves to dismiss Sugentino Percel's ("Percel") motion to vacate, set aside, or correct conviction or sentence under 28 U.S.C. § 2255, or in the alternative, moves for summary judgment, for the following reasons.

### Jurisdiction

This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. § 2255.  Percel's original pleading under 28 U.S.C. § 2255 was timely. Percel is incarcerated at the Federal Bureau of Prisons facility in Loretto, Pennsylvania.  He seeks federal habeas corpus relief under 28 U.S.C. § 2255 from his conviction in the Houston Division of the Southern District of Texas.  A § 2255 motion "provides the primary means of collaterally attacking a federal conviction and

sentence." *Jeffers v. Chandler*, 253 F.3d 827, 830 (5th Cir. 2001) (citing *Tolliver v. Dobre*, 211 F.3d 876, 877 (5th Cir. 2000)).  Relief under a § 2255 motion is warranted "for errors that occurred at trial or sentencing."  *Jeffers*, 253 F.3d at 830 (citing *Cox v. Warden*, 911 F.2d 1111, 1113 (5th Cir. 1990)).  Percel seeks relief from his conviction and sentence.

## Denial

The United States denies each and every allegation of fact made by Percel, except those supported by the record and specifically admitted herein, and demands strict proof thereof.

## Course of Proceeding and Prior Disposition

On November 20, 2006, a jury found Percel guilty of conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii) and 846 (count one) and of aiding and abetting in the knowing and intentional possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §841(a)(1) and § 841(a)(1)(A)(ii) and 18 U.S.C. § 2 (count two).  (D.E. 184).[1]  On March 16, 2007, Percel was sentenced to 151 months imprisonment in the United States Bureau of Prisons as to counts one and two,

---

[1]  "D.E." refers to the docket entries in Criminal Number H-06-89, Styled *United States v. Bonifacio Hernandez, et al.*, in the Houston Division of the United States District Court for the Southern District of Texas.

with the terms to run concurrently, for a total term of imprisonment of 151 months; to be followed by five years supervised release as to counts one and two, with the terms of supervised release to run concurrently, for a total term of five years supervised release.  In addition, the district court imposed the mandatory special assessment of $200 and imposed a fine of $17,500, both of which were due and payable immediately.  (D.E. 281, 302).

Percel appealed his conviction and sentence to the United States Court of Appeals for the Fifth Circuit alleging that the district court committed reversible error in its jury instructions and that the district court misapplied FED. R. EVID. 404(b) in allowing German Arias to testify about Percel's involvement in an earlier cocaine transaction.   The Fifth Circuit affirmed Percel's conviction and sentence in a published opinion.  *See United States v. Percel*, 553 F.3d 903 (5th Cir. 2008).

The Supreme Court denied Percel's application for a writ of *certiorari* on April 27, 2009.  *United States v. Percel*, 129 S. Ct. 2067 (2009) (No. 08-9466).

### Statement of Facts[2]

Drug Enforcement Administration (DEA) Special Agent Craig Cornelius had been with the DEA for three years.  Cornelius had been in the narcotics division of the

---

[2] All citations to the record ("R.") within the Statement of Facts are to the record on appeal as assembled by the district clerk for Sugentino Percel on his direct appeal to the Fifth Circuit.  All four days of trial testimony were transcribed and all four transcripts appear as Docket Entry Number 385 on this Court's docket.  Citation to page numbers of that document is not possible.

Harris County Sheriff's department for the six years prior to that.  Cornelius identified Osorio, Percel and Vasquez as individuals he arrested on February 21, 2006.  (R. 595-97).

At approximately 9:30 on the morning of February 21, 2006, Cornelius and other agents and officers began a narcotics investigation at two addresses – 7430 Weatherhill and 7622 Lima – both in Harris County, Texas.  Agents saw Escobar (GX 80) drive to 7622 Lima and pick up DeLeon (GX 77) in a dark colored GMC Denali. The two men drove to 8915 Alejo, also in Harris County, Texas.  From there, the two men went to an apartment and then to Bravos Restaurant, located at Highway 290 and Bingle Road.  (R. 597-600).

Bravos Restaurant

Escobar and DeLeon arrived at Bravos between 11:00 a.m. and 11:15 a.m., and Hernandez (GX 79) soon arrived in a grey Jeep Cherokee.  The three men met inside the restaurant and spent some time there.  Hernandez left Bravos in the Cherokee. Escobar and DeLeon left Bravos in the Denali and drove to 7430 Weatherhill.  Agents saw a green Ford Explorer already parked at 7430 Weatherhill address when Escobar and DeLeon arrived.  (R. 600-02, 903-07).  Detective James Wright, a sixteen year veteran of the Pasadena Police Department (PPD) made a video recording, and later a DVD (GX 72), of several events that happened on February 21, 2006.  (R. 899-904).

4

## 7430 Weatherhill

At approximately 5:00 p.m., DeLeon walked out of 7430 Weatherhill carrying a black duffle bag (GX 10) with two straps.  The bag "appeared to be heavy" and DeLeon placed it in the Explorer.  The bag was later recovered at 8915 Alejo, and it was found to contain a money counter (GX 9).  After DeLeon placed the black bag in the Explorer, DeLeon picked up a rake and "started acting like he was raking in the front yard."  Actually, DeLeon "was watching around, looking up and down the street."  (R. 602-03, 908-10).

Escobar soon exited the Weatherhill house carrying "black plastic bags" which obviously held "heavy brick-shaped objects protruding through the plastic."  The bags were heavy – "you could tell it was a lot of weight.  He was struggling with it." Escobar placed the black plastic bags in the Explorer.  The black plastic bags appeared to contain kilogram bricks of cocaine.  (R. 604, 909-11).  Garcia (GX 78) exited the Weatherhill house and began talking to Escobar and DeLeon in the front yard.  Garcia spoke to someone using Escobar's cell phone, then Escobar and DeLeon got into the Explorer and drove off.  (R. 605-06, 910-12).

## 8915 Alejo

At approximately 5:30 p.m., Escobar and DeLeon arrived at 8915 Alejo.  In a few minutes, a woman named Diaz left the house.  Escobar and DeLeon then went to

5

the Explorer, removed the duffle bag and the plastic bags and carried them inside. The house at 8915 Alejo (GX 40, 41) had a drive-way to the right of the house, as one approached from the street, which led to a one car garage.  The front door to the house was just off the driveway.  (R. 606-08, 913-14).

A short time later, Escobar left 8915 Alejo and drove to Bravos Restaurant, which was nearby.  DeLeon remained in the house.  Escobar met Hernandez (GX 79), Percel (GX 73) and Arias (GX 76), who had all arrived in the same Jeep Cherokee, in the parking lot of Bravos.  All four men got into the Explorer and returned to 8915 Alejo, where Percel and Arias carried heavy black bags into the house.  (R. 608-10).

At approximately 8:00 p.m., Escobar left 8915 Alejo in the Explorer and drove to a nearby AutoZone, where he purchased canned axle grease (GX 8).  Escobar soon left the AutoZone and drove to 3737 Watonga, where he parked in the vicinity of Osorio's apartment.  Osorio (GX 75) and Vasquez (GX 74) got into Escobar's Explorer and all three men drove back to 8915 Alejo.  Escobar parked in the driveway and he, Osorio and Vasquez went into 8915 Alejo through the front door.  It was now approximately 8:30 p.m.  (R. 611-15).

### 3737 Watonga

Approximately fifteen minutes later, Escobar, Osorio and Vasquez got back in the Explorer and drove back to 3737 Watonga.  Escobar stayed in the Explorer while

Osorio and Vasquez got into a minivan (GX 27) with Illinois license plates.  Vasquez was in the driver's seat with Osorio was in the front passenger's seat.  (R. 616-17, 619, 622).

### 8915 Alejo, Again

Vasquez drove the minivan and followed Escobar back to 8915 Alejo.  Escobar drove past the garage as the garage door was opened and Vasquez drove the minivan into the garage, after which the garage door was quickly closed.  Escobar pulled into the street and then backed the Explorer up the driveway so that the rear of the Explorer "butted up next to the garage door."  Escobar went inside.  By this time it was approximately 10:00 p.m.  (R. 618-19).

About 11:10 p.m., Escobar came outside, got into the Explorer and began to drive off.  At the same time, the garage door opened and Arias (GX 76) backed the minivan down the driveway.  Osorio was in the passenger seat.  The garage door was closed as soon as the minivan left the garage.  Escobar waited for the minivan and the two vehicles drove off "in tandem" toward Bingle Road.  (R. 619-20).

### Traffic Stop

At approximately 11:15 p.m., a marked Harris County Sheriff's (HCS) Department patrol unit stopped the minivan on Bingle Road.  The deputy in this particular HCS unit had a drug detecting canine with him.  At the time the minivan

7

was stopped, it was traveling on Bingle Road in the direction of 3737 Watonga. Other agents continued to follow Escobar in the Explorer. (R. 620-22, 626).

A search of the minivan yielded ten kilograms of cocaine hidden inside a void in "the right [rear] quarter panel where the taillight is removed." Agents removed a rear panel inside the minivan and removed the cocaine. (R. 622-24; GX 29, 30, 32, 33, 34). Cornelius estimated that the cocaine would be worth $20,000 to $25,000 per kilogram, or approximately $250,000 total, in Boston. (R. 665-66).

The cocaine from the minivan (GX 36) was packed in one kilogram bricks and each brick was wrapped in cellophane. A layer of grease or menthol had been applied to each brick. Each brick was then re-wrapped with green cellophane and placed inside a vacuum sealed baggie. All of this was an attempt to conceal the odor of the cocaine from a drug detection canine. (R. 624-25).

When officers stopped the minivan, Escobar "circled back around, drove back by the traffic stop and then came back toward the Alejo address." Escobar drove back past the minivan approximately eight to ten minutes after the initial stop. Escobar then drove to 8915 Alejo but, instead of turning into the driveway, Escobar stopped next to the driveway. (R. 625-26).

Immediately before Escobar arrived at 8915 Alejo, agents watching the house saw "what was kind of like a deer in the headlights, guys sticking their heads out the

door to see if anybody was around and kind of tiptoeing out to the front yard, looking

around to see . . . what was going on."  Then Hernandez, DeLeon, Percel and Vasquez

"moved quickly" from the residence to the Explorer, which then "took off at a high

rate of speed."  Escobar was going 60 mph in a 30 mph speed zone, and agents saw

him "running red lights [and] stop signs."  Agents stopped the Explorer near Osorio's

apartment at 3737 Watonga.  (R. 626-28).

Search of Osorio's Apartment – 3737 Watonga

A consent search of Osorio's apartment yielded a roll (GX 5) of "industrial-size

Saran Wrap, greenish color" and vacuum sealing bags (GX 6), which were identical

to the green cellophane outer wrapping and the vacuum sealing bags on the ten bricks

of cocaine (GX 36) found inside the minivan. (R. 628-30).  Both the green cellophane

and the sealing bags had cocaine residue on them.  Agents also found a small scale

and some baggies (GX 82) with cocaine residue on them in Osorio's kitchen.  (R. 811-

14, 815).

Search of 8915 Alejo

A search of the kitchen area residence at 8915 Alejo yielded a heat sealing

machine (GX 7) and a trash bag containing "kilo wrappings (GX 11)," which were

described as the original outer wrapping on the cocaine when it was brought to

Houston from Mexico.  After the cocaine arrived, it would have been opened for

9

inspection by potential buyers and then re-wrapped after it was sold.  (R. 630-33, 637).  Agents found a second trash bag (GX 12) containing rubber gloves smeared with grease, some of the grease itself, greasy paper towels, and used green cellophane. All of this was consistent with wrapping cocaine bricks in plastic or cellophane, coating the wrapped bricks with grease, and then re-wrapping the bricks with cellophane.  (R. 633-34, 641-42).  Agents found "a brand new tool set (GX 13)" which was used to remove and the replace the rear panel from the inside of the minivan.  (R. 634-35, 641-42).

Agents found Febreeze fabric softener sheets, Vicks VapoRub, unused rubber gloves, tape and two or three cans of axle grease.  (GX 11, 12, 13).  Cocaine was often packed inside one layer of plastic or cellophane and then taped shut, both to provide protection for the cocaine powder and to allow a potential buyer to remove a small sample through a cut or slit in the wrapping, which could then be taped shut.  Agents found the electronic money counter (GX 9) inside a black bag (GX 10) in the kitchen area with all of the other items.  (R. 635-37, 641-42, 670-71).

Inside a front bedroom at 8915 Alejo, agents found two plastic bags (GX 47, 49, 50) which contained a total of 25 kilograms of cocaine.  The bags were on top of a bed "with a bunch of stuff scattered everywhere" and "it looked like someone tried to hide it [the cocaine] by just throwing some sort of blanket or something over it."

10

This 25 kilograms of cocaine was wrapped in the same manner as the 10 kilograms of cocaine (GX 36) found in the minivan. (R. 637-40).

Search of 7430 Weatherhill

Late on February 21, or in the early morning hours of February 22, agents searched the residence at 7430 Weatherhill. There they found two digital scales (GX 14, 15) which were used to weigh narcotics, and a "finger scale" (GX 16), which was used to weigh smaller quantities of narcotics. The agents also recovered some smaller plastic bags (GX 17) which would have been used to sell cocaine in small "street" quantities. Some of the smaller plastic bags had unique markings, such as blue dots or whales, and the bags were of a size which accommodate approximately one gram of cocaine. (R. 642-45).

Agents found a vacuum sealing machine (GX 20) and green cellophane wrapping (GX 22) which were "identical" to the vacuum sealing machine and the green cellophane wrapping found at 8915 Alejo. Agents also found $47,000 in currency (GX 54, 63); a semi-automatic handgun; and 8 kilograms of cocaine (GX 2, 59, 61). (R. 645-50).

The 8 kilograms of cocaine found at Weatherhill differed from the two cocaine seizures in that the cocaine seized at Weatherhill appeared to be in "post-transportation" or "pre-repackaging" condition. That is, these eight cocaine bricks

11

were packed in a single layer of plastic, as if they were on display to potential buyers. There was no coating of grease or other material on the bricks and there was no secondary plastic wrapping. (R. 650-51).

White Dodge Pick-up Truck

Agents found a white Dodge pickup truck (GX 68) at Weatherhill which contained a hidden compartment (GX 70) behind the cab area that would have held approximately 50 kilograms of cocaine. This Dodge belonged to Garcia (GX 78), who was at 7430 Weatherhill when the agents searched that house. (R. 651-53).

Agents found a Massachusetts driver's license on Vasquez with an address in the area of Boston. Agents found that Osorio lived at 3737 Watonga. (R. 617-18, 653-54). Agents found a Wisconsin driver's license on Percel. (R. 653-54).

All of the addresses in this case – 3737 Watonga, 8915 Alejo, 7430 Weatherhill, Bravos Restaurant, AutoZone and the site of the traffic stop – were within three to four miles of each other. (R. 655-58; GX 81).

Although Osorio was working at a printer shop in Houston during the day on February 21, 2006, he was using his cell phone to help broker the cocaine transaction. Osorio's cell phone records showed several calls made during that day from Osorio's cell phone to the cell phones of various co-defendants. (R. 679-83).

### The Chemists

Derek Sanders, a forensic chemist for fifteen years, determined that the ten kilogram bricks (GX 34) seized from the minivan weighed 9.89 kilograms, excluding the wrapping, and that each brick was cocaine hydrochloride.  Sanders determined that the twenty-five kilogram bricks (GX 52) seized from 8915 Alejo weighed 24.9 kilograms, excluding the wrapping, and that each brick was composed of cocaine hydrochloride.  (R. 702-14).

Claudia Busby, a forensic chemist for twenty years, determined that the eight kilogram bricks (GX 59, 61) which had been seized from 7430 Weatherhill weighed 7.8 kilograms, excluding the wrapping, and that they were 86% pure cocaine hydrochloride.   Busby also examined other items seized from 7430 Weatherhill, including, but not limited to: a baggie containing 13.6 grams of 96% pure cocaine base, or crack cocaine; a baggie containing 65.3 grams of 86% pure cocaine hydrochloride; a baggie containing 20.4 grams of cocaine hydrochloride; 21½ tablets containing a total of 5.0 grams of 3, 4 methylenedioxymethamphetamine, or MDMA, also known as Ecstacy; a baggie containing 4.7 grams of marijuana; a baggie containing 2.8 grams of marijuana; a blue baggie containing 2.2 grams of 85% pure cocaine hydrochloride; and 12 tablets containing a total of 1.4 grams of MDMA, or Ecstacy.  (R. 720-28).

Co-Defendant DeLeon

Baldomero DeLeon was arrested on February 21, 2006, for his involvement in a cocaine conspiracy.  Percel, Vasquez and Osorio were all three involved in the cocaine conspiracy with DeLeon, and he identified all three men in the courtroom. (R. 732-33).  DeLeon pled guilty under the terms of a written plea agreement.  (R. 748-50).

DeLeon met Osorio through Escobar one or two months before February 21. Osorio told DeLeon that Osorio could broker a cocaine deal with "people" he knew. The "people" turned out to be Vasquez and Percel.  DeLeon first met Vasquez and Percel on February 21when Osorio told DeLeon that Vasquez and Percel wanted to buy either 25 or 35 kilograms of cocaine.  (R. 744-46, 750, 779-80).

DeLeon said that he started at one house where the drug was and that he and others took the drug to another house, although he did not know that street number or the street name for either house.  DeLeon and Escobar brought the drug out of the first house [7430 Weatherhill] in "a black bag and two black plastic bags."  DeLeon identified a photo of the black duffel bag (GX 45) as the black bag which contained some of the drug when he and Escobar left the first house.  DeLeon also saw a money counter (GX 46) at the first house.  (R. 734-37).  The first house was a stash house where the cocaine was stored after Garcia brought it to Houston from Mexico

14

concealed in a compartment in Garcia's truck (GX 69, 70).  (R. 737-38, 754).

DeLeon rode with Escobar to another house [8915 Alejo], where he and Escobar placed the three bags containing cocaine in the kitchen.  Later that afternoon, Hernandez (GX 79), Osorio, Vasquez, and Arrias (GX 76) arrived at the second house.  (R. 738-39).  Everyone there – Hernandez, Percel, Vasquez, Arias and DeLeon – was involved in "packaging" the cocaine.  That is, the cocaine was removed from its original packaging, wrapped in "green paper," coated with grease, wrapped in more "green paper," and finally "the vacuum machine would seal it with transparent paper." (R. 739-40).

Osorio arrived while this "packing" occurred and spoke to Escobar, Hernandez and DeLeon.  Osorio discussed the cocaine deal with Escobar, and stated that "he" had to go and pick someone up.  Osorio also stated that "he wanted to be there in case something happened."  (R. 740-41).

Escobar, Arias and Vasquez left to get the van, which was brought to the second house [8915 Alejo], where the cocaine was being re-packaged.  The van was parked in the garage, the garage door was closed, and Vasquez, Percel and Arias packed cocaine into the van.  After the van was loaded, Arias drove the van off with Osorio as a passenger.  (R. 741-43, 759-60).

Escobar was followed the van.  Escobar called later to say that the police had

stopped the van and that there were problems.  Escobar returned to the house to pick everyone up, and the group was headed to Osorio's apartment when they were all arrested.  (R. 743-44).

Ten kilograms were put into the van at 8915 Alejo and 25 kilograms were left inside the house.  Osorio was to leave the van containing 10 kilograms at his apartment complex and return to 8915 Alejo to pick up the remaining 25 kilograms and to pay for all 35 kilograms.  There was a money counting machine at 8915 Alejo to count the cash that Osorio was supposed to bring.  Percel, Vasquez and Arias said that they were taking the cocaine to Boston or New York.  (R. 745-50, 761).

A man named Chapa in Mexico owned the cocaine.  Chapa hired Garcia to smuggle the cocaine to Houston in a white Dodge truck.  Escobar stored the cocaine in Houston.  DeLeon assisted in the sale and he was to have received $2,000 to $3,000.  DeLeon sold 35 kilograms of cocaine to Osorio and Hernandez for $14,400 or $14,500 per kilogram.  Osorio and Hernandez, in turn, sold the cocaine to Percel, Vasquez and Arias for $15,000 per kilogram.  Everyone was arrested before DeLeon got any money. Garcia was supposed to have smuggled the proceeds from the sale back to Chapa.  (R. 756-59, 764-65, 791-92, 796-97).

Co-Defendant Arias

German Rafael Arias was arrested on February 21, 2006, while he was driving

16

a Dodge van (GX 28).   Percel and Vasquez had arranged the entire trip; they had

rented the van in Boston; they arranged for two women (Maria and Luz) to drive the

van to New York and pick Arias up; they had given the two women money to pay for

expenses.  Arias identified Vasquez, Percel, and Osorio in the courtroom.  (R. 824-28,

858-59).  Arias pled guilty to drug charges and testified under the terms of a written

plea agreement.  (R. 851-52).

Arias had been close friends with Percel for 28 years.  Percel told Arias that

Percel lived in Milwaukee and that Percel's family lived in Boston.  Arias met

Vasquez through Percel, and Arias had known Vasquez for approximately seven

years.  Vasquez told Arias that Vasquez lived in Boston.  (R. 828-32).

Arias came to Houston with the two women to buy cocaine.  After the trio

arrived in Houston, Arias parked the van at Osorio's apartment complex.  Hernandez

(GX 79) and Vasquez were in Osorio's apartment when Arias arrived.  (R. 832-35).

Escobar (GX 80) took Arias to a house [8915 Alejo] where there was cocaine

on a table inside the first room in the house.  Vasquez, Percel, Escobar, Hernandez and

DeLeon (GX 77) were also at this house.  Osorio arrived later.  Arias, Vasquez and

Percel put on gloves; smeared the cocaine bricks with grease, mustard, and menthol;

and then re-wrapped the bricks with green plastic wrap.  The three men re-wrapped

a total of 35 one kilogram bricks.  (R. 835-37).

17

Vasquez, Osorio and Escobar went to get the Dodge van.  Vasquez backed the van into the garage, Arias took a screwdriver and took out a panel in the rear of the van, and then Arias, Vasquez and Percel packed 10 kilogram bricks of cocaine into the area under the panel which Arias removed.  Hernandez and DeLeon stood and watched.  Escobar acted as look-out.  Arias replaced the panel to hide the cocaine, and he and Osorio drove off in the van toward Osorio's apartment.  (R. 837-41).

The police stopped Arias and Osorio before they got to Osorio's apartment.  Arias was to park the van near Osorio's apartment and return to the house on Alejo in another vehicle for the remaining 25 kilograms of cocaine.  (R. 842-44).  Arias met Hernandez and Osorio through Percel and Vasquez.  (R. 849).

Arias was supposed to have received $10,000 for driving the van back toward Boston.  (R. 847-48).  Arias was supposed to have handed the van over to "a man and a woman" for the drive back to Boston.  Arias was supposed to fly back to Boston after he handed the van over to the man and the woman.  (R. 849-51).

### RULE 404(b) Evidence

Prior to trial, the United States filed notice of intent to offer evidence that Percel and Vasquez had purchased 15 kilograms of cocaine at Osorio's apartment and then packed the cocaine in a vehicle for delivery to Boston, Massachusetts.  (R. 292-96, 331, 804-08).  This Court ruled that the evidence was admissible under FED. R. EVID.

18

404(b).  (R. 804-08).

Arias testified that he drove a rented van from New York to Osorio's apartment in Houston in December, 2005, or January, 2006.  There, Percel and Vasquez helped Arias conceal the 15 kilograms in the van.  Arias drove the van toward Boston and handed it over to a man and a woman who drove it to Boston.  Arias received $5,000 for this trip, so he knew that the cocaine arrived in Boston.  Arias was to have received $10,000 for the February, 2006, trip, because he was hauling more cocaine on the second trip.  (R. 844-51, 865-67).  After Arias completed his direct testimony, the district court gave a cautionary instruction to the jury.  (R. 855-56).

The United States rested (R. 977) and counsel for all three defendants moved unsuccessfully for judgments of acquittal, under FED. R. CRIM. P. 29(a).  (R. 978).

### Defense Witnesses

Percel testified on his own behalf.  (R. 986).  Percel has a car export business; he buys used cars and ships them to the Dominican Republic.  (R. 987).  He came to Houston with his friend Rene to visit some relatives.  (R. 987-88, 1017).  When he arrived, Vasquez called and invited him to dinner.  (R. 988, 1018).  He had met Vasquez in 2000 or 2001 at a "little store" Percel and his sister ran in New York.  (R. 990).

Percel met Vasquez at the Watonga address; Hernandez was also there.  (R.

19

990).  They invited Percel to a party they were having later at a cantina with some "ladies".  (R. 990-91).  They went to Bravos, then to the house on Alejo.  (R. 992). Deleon and Arias were already there; Percel had not met Deleon, Hernandez or Escobar before.  (R. 993, 1005-06).  Percel was surprised to see Arias there; he had known Arias when they were young boys back in the Dominican Republic, but had lost touch with him.[3]  (R. 944, 1019, 1020).  Escobar brought Osorio to the Alejo house later, around 9:00 to 10:00 p.m.  (R. 994, 1022).  Percel did  not know Osorio. (R. 1039).  Osorio "came in, he said hello, he sat on the sofa."  Percel did not see him giving instructions or packaging anything.  (R. 1043).  Percel does not think Osorio had anything to do with the cocaine.  (R. 1043).

Percel never went into the kitchen or the garage.  (R. 995, 1009, 1024).  He left with the others around 11:00 p.m.; they said they were going to Osorio's house, then to the cantina.  (R. 1004, 1009).  Percel never noticed anything suspicious going on at the house.  (R. 995, 1029, 1045).  He never saw any cocaine.  (R. 1030, 1042).  He never saw the minivan.  (R. 1032).  He denied being involved in the cocaine transaction charged in the indictment and he denied being involved in the earlier transaction that Arias described.  (R. 1002-03).

---

[3]  In contrast, Arias testified that he had known Percel since Arias was 7 years old; that he considered Percel a close friend and a brother; that he would see Percel every month; and that he spoke to Percel almost every day.  (R.  828-29).

Vasquez did not testify. (R. 1062-63). Vasquez called Rosanna Peralta, who testified that she had been Vasquez's girlfriend fro four years; they lived in Boston with their little girl; Vasquez worked as a mechanic; and that they had discussed moving to Houston to open a restaurant. (R. 1045-51). Peralta admitted that she and Vasquez had money problems during 2006. (R. 1055-56).

Osorio did not testify (R. 1089-90); instead, he called his boss Robert Bosley to testify. (R. 1068). Bosley has known Osorio for 10 to 12 years. (R. 1069-71, 1078). However, they had a strictly business relationship and did not socialize. (R. 1070, 1078).

Osorio started working at Bosley's printing company at the beginning of 2006. (R. 1070-71). Osorio was a salaried, full-time worker; he sometimes worked six or seven days a week. (R. 1072). His regular hours are 8:00 a.m. to 5:00 p.m., but it is not unusual for him to work past 5:00 p.m.; some days Osorio and Bosley worked twelve hours. (R. 1075). Osorio does not punch a time clock. (R. 1073-74).

Osorio was at work on February 21, 2006, but Bosley had no records showing what time he left. (R. 1073, 1076). Bosley had no way to monitor his employees' cell phone usage. (R. 1076-77). Osorio could have made a series of phone calls throughout the day without Bosley's knowledge. (R. 1076-77).

The defendants rested and renewed their motions for judgments of acquittal,

which were denied again.  (R. 1090).  The jury found all three defendants guilty on

both counts.  (R. 1187-88).  This Court polled the jury and accepted the verdicts.  (R.

1188-90).

## Guidelines Calculations

The PSRs for Percel and Vasquez were virtually identical.  Using the 2006

edition of the *Guidelines Manual*, the probation officer determined that Vasquez and

Percel were each responsible for 34.8 kilograms of cocaine – 9.9 kilograms found in

the minivan and 24.9 kilograms found at Osorio's apartment at 8915 Alejo.  (PSR ¶¶

37, 43).  The probation officer recommended a base offense level of 34 for Vasquez

and for Percel, under U.S.S.G. § 2D1.1(3)(c).  (PSR ¶ 44).  The total offense level for

Vasquez and for Percel was 34.  (PSR ¶¶ 51, 53).  Neither Vasquez nor Percel had a

prior criminal record, which gave both men zero criminal history points and placed

them each in criminal history category I.  (PSR ¶¶ 54-56).  Each of the two counts of

conviction carried a mandatory minimum term of imprisonment of ten years, or 120

months, under 21 U.S.C. § 841(b)(1)(A)(ii).  (PSR ¶ 77).  A total offense level of 34

and a criminal history of I provided for an advisory Guidelines range of imprisonment

of 151 to 188 months for Vasquez and for Percel.  (PSR ¶ 78).

## Sentencing Hearing

Neither Percel nor Vasquez filed substantive objections to the PSR.  Their

objections pertained to factual matters which had no bearing on the Guideline calculations. (R. 1210-11). This Court overruled all objections and adopted both PSRs *in toto*. (R. 1211-12).

After brief argument from counsel and allocution from each defendant, the district court determined that the lower end of the applicable Guideline range for each defendant was sufficient to accomplish the sentencing objectives listed in 18 U.S.C. § 3553(a). The district court then sentenced Vasquez and Percel each to 151 months, to be followed by five years of supervised release, special assessments of $200 and fines of $17,500. (R. 1213-16, 1216-19).

## Issues Presented in Habeas Motion

In his motion under 28 U.S.C. § 2255, Percel alleges ineffective assistance of counsel as follows: (1) trial counsel failed to advise Percel that any uncharged portion of the alleged drug quantity could be used to calculate his sentence; (2) trial counsel failed to explain the Guidelines to Percel prior to and after the trial, specifically the acceptance of responsibility and safety valve provisions and the advantages of pleading guilty; (3) trial counsel failed to object allegedly erroneous jury instructions; (4) trial counsel failed to interview co-defendants who would have testified to Percel's innocence; (5) trial counsel failed to advise Percel about the risks of testifying on his own behalf, and failed to prepare Percel to testify; and (6) the cumulative impact of

the trial counsel's errors constitute ineffective assistance.

## ARGUMENT

## PERCEL HAS FAILED TO DEMONSTRATE EITHER PRONG OF INEFFECTIVE ASSISTANCE OF COUNSEL IN ANY OF HIS VARIOUS CLAIMS.  HE IS ENTITLED TO NO RELIEF.

### A.  Standard of Review.

The Court reviews Percel's claims of ineffective assistance of counsel under the test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052  (1984). Percel must prove that (1) his counsel's performance was deficient and (2) that deficiency prejudiced his defense.  *Id*. at 687-88;  *United States v. Kimler*, 167 F.3d 889, 892-93 (5th Cir. 1999).  Under the first prong, "an attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable."  *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1995).  Counsel's performance must be judged in light of all the circumstances.  *United States v. Haese*, 162 F.3d 359, 364 (5th Cir. 1998).  Under the second prong, Percel must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Pratt v. Cain*, 142 F.3d 226, 232 (5th Cir. 1998) (quoting *Strickland*, 466 U.S. at 694).  "The second prong focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."  *Haese*, 162 F.3d at 364.  If Percel fails one of the

24

two prongs, he has failed to state a claim for ineffective assistance and the court need not continue with the *Strickland* analysis.  *Armstead v. Scott*, 37 F.3d 202, 210 (5th Cir. 1994).

### B.   Percel's Complaint that Counsel Failed to Explain that Uncharged Drug Quantities Could be used in Calculating his Sentence, if True, was Neither Deficient nor Prejudicial.

In his first point, Percel alleges that his trial counsel failed to advise him that uncharged drug quantities could be considered in calculating his sentence. "[C]onclusory allegations of ineffective counsel do not raise a constitutional issue in a federal habeas proceeding. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000). Percel's statements are mere conclusory allegations and unsupported by the record. The record shows that during the sentencing hearing, Percel confirmed that he read and discussed the PSR with his attorney.  (D.E. 281, 302, 397).  The PSR contained the information regarding the amount of drugs considered to calculate Percel's base offense level.  (PSR ¶¶ 9-10).  "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629 (1977).  Therefore, Percel cannot now claim that he was not informed about the amount of drugs to be used to calculate his sentence.

Even if the allegations are true and objectively unreasonable, Percel has failed to prove prejudice.  To show prejudice with regard to sentencing issues, Percel "must

25

show a reasonable probability that but for trial counsel's errors his non-capital sentence would have been significantly less harsh." *United States v. Segler*, 37 F.3d 1131, 1136 (5th Cir. 1994) (citing *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993)). Even if counsel had explained this element to Percel prior to sentencing, the fact remains that the uncharged drugs were lawfully considered into the sentencing calculation. Percel does not allege an action that, if taken by counsel, could have resulted in a less harsh sentence.

### C.   Percel Fails to Demonstrate Deficient Performance of Trial Counsel with Regard to Trial Counsel's Alleged Failure to Advise Percel on the Possible Guidelines Sentencing Reductions for Acceptance of Responsibility and Safety Valve.

Percel next argues that counsel failed to explain the Guidelines, specifically the acceptance of responsibility and safety valve reductions. He contends that if counsel would have explained these reductions, he would have pled guilty instead of proceeding to trial. Again, these statements are conclusory and do not give rise to a habeas issue. *See United States v. Angulo*, 54 F. App'x 794 (5th Cir. 2002) (unpublished)[4] (holding that defendant's allegations of ineffective assistance that counsel failed to explain possible benefits of pleading guilty such as the safety valve

---

[4] Unpublished opinions issued on or after January 1, 1996, are not precedent, except under certain circumstances not present here. An unpublished opinion may, however, be persuasive. *See* 5TH CIR. LOC. R. 47.5.4.

provision, were conclusional and did not establish ineffective assistance).

In addition, Percel has not proven that if counsel had explained these Guidelines nuances, the result of the proceeding would have changed. First, Percel still maintains that he is innocent (Percel 2255 motion, p. 5), so he could not have entered a guilty plea. *See Welch v. United States*, 370 F. App'x 739, 742-43 (7th Cir. 2010) (prejudice cannot arise form from proceeding to trial in lieu of pleading guilty when defendant insists he is innocent). It is well-established that counsel does not have an absolute obligation to pursue plea negotiations in every case. *See United States v. Wells*, 394 F.3d 725, 735 (9th Cir. 2005); *Armienti v. United States*, 313 F.3d 807, 814-15 (2d Cir. 2002); *United States v. Boone*, 62 F.3d 323, 327 (10th Cir. 1995); *Beans v. Black*, 757 F.2d 933, 936 (8th Cir. 1985); *Dillon v. Duckworth*, 751 F.2d 895, 901 (7th Cir. 1985).

To the extent that Percel argues that trial counsel should have ignored his protestations of innocence and independently approached the United States about a potential plea deal, his position is untenable. This Court does not require trial defense counsel to do that which is futile, and thus it would not mandate that counsel engage in the empty endeavor of negotiating a plea agreement for a client who has made it clear that he has no interest in entering a guilty plea. *See United States v. Goodley*, 183 F. App'x 419, 423 (5th Cir. 2006) ("we have repeatedly stated that the

27

performance component of *Strickland* does not require counsel "to make futile motions or objections") (citing *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990); *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995) (stating that trial counsel's failure to file a motion to suppress evidence did not constitute deficient performance under *Strickland* because "[c]ounsel is not required by the Sixth Amendment to file meritless motions")); *see also*, *Wells*, 394 F.3d at 735 (rejecting defendant's ineffective assistance claim when it was his unwillingness to plead guilty that prevented counsel from initiating plea negotiations); *Armienti*, 313 F.3d at 814-15 (same).

Finally, even if Percel had pled guilty, there is no guarantee that he would have received offense level reductions for either acceptance of responsibility or safety valve.  *See United States v. Botello*, Cr. No. C-03-258(2), 2007 WL 922220, slip op. at 6 (S.D. Tex. Mar. 23, 2007) (finding no prejudice because receiving a reduction for acceptance of responsibility is not a certainty) (citing *United States v. Faubion*, 19 F.3d 226, 228-30 (5th Cir. 1994)).

### D.   Percel has Failed to Demonstrate that Trial Counsel's Performance was Deficient for Allegedly Failing to Lodge a Meritless Objection to the Jury Instructions.

Percel alleges that counsel was ineffective during the guilt/innocence phase by failing to object to the jury instructions.  He claims that the jury instructions were

28

improper because the district court left out the word "not" and read to the jury: "no inference whatever may be drawn from the election of a defendant to testify." However, the corrected instructions were sent to the jury.  Percel's appellate counsel, who was not Percel's trial counsel, raised this issue on Percel's direct appeal, and it was rejected by the Fifth Circuit.  *See United States v. Percel*, 553 F.3d 903, 908-10 (5th Cir. 2008).  "It is settled in this circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 motions."  *United States v. Webster*, 421 F.3d 308, 310 n.7 (5th Cir. 2005) (citations omitted); *United States v. Mitchell*, 263 F.3d 162 (5th Cir. 2001); *United States v. DuPre*, 247 F.3d 241 (5th Cir. 2001).

Although the error was reviewed under the plain error standard, the result would not have changed under any other standard.  *See United States v. Gold*, 743 F.2d 800, 822 (11th Cir. 1984) (holding that although the instructions were read as not to require proof beyond a reasonable doubt, the error was harmless beyond a reasonable doubt because the judge let the jury take accurate, written instructions into the jury room).  "An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue." *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999).  Since the district court's

simple omission of a single word in reading the correctly worded jury instruction was harmless error, any objection to the correctly worded jury instruction would have been meritless, and Percel's argument for ineffective assistance fails.

### E.   Percel Has Failed to Demonstrate that Trial Counsel was Deficient for His Alleged Failure to Interview Co-defendants Who Allegedly Would Have Testified in Percel's Favor.

Percel alleges that trial counsel was ineffective because he failed to interview the co-defendants who allegedly would have exculpated Percel.  Counsel's trial strategy is given great deference and is "virtually unchallengeable." *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (quoting *Strickland*, 466 U.S. at 691).  Also, "complaints based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain." *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (citing *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983).

The Fifth Circuit has recognized that a complete failure to "interview potential witnesses and . . . make an independent investigation of the facts and circumstances of the case" is unreasonable.  *Bryant*, 28 F.3d at 1415 (quoting *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985).  However, Percel "must show not only that this testimony would have been favorable, but also that the witness would have testified

30

at trial." *Alexander*, 775 F.2d at 602.

Percel includes two affidavits from co-defendants stating that Percel was not involved in the drug conspiracy and that they would have testified to that fact. However, one of the two co-defendants, German Arias, testified **against** Percel at trial. (D.E. 385). Arias now alleges that he coerced into testifying and that if counsel had interviewed him prior to start of trial, this coercion would have been evident. (Percel's 2255 Memorandum, p. 28).

Arias, who was deported to the Dominican Republic after serving his prison term, admits to perjuring himself during the trial. (Arias Affidavit, p. 2). Percel has failed to show that Arias would have been a favorable witness at the time of the trial when Arias testified against Percel and for the United States. In addition, Percel's trial counsel cross-examined Arias at trial and elicited testimony in an attempt to impeach Arias about Percel's prior drug transactions. (D.E. 385). This evidences counsel's preparation for the witness.

Percel has failed to prove that counsel's strategy was objectively unreasonable and that, had Arias been interviewed prior to trial, he would have testified in favor of Percel. Percel fails to satisfy either prong of the *Strickland* test.

Percel also provides an affidavit from co-defendant Bonifacio Hernandez, who originally pled guilty and who is now in the Federal Bureau of Prisons in Florida.

(Hernandez Affidavit, ¶ 1). Hernandez has provided in his sworn affidavit that he informed his attorney that he would be willing to testify on behalf of Percel and his attorney discussed this with Percel's counsel. (Hernandez Affidavit, ¶¶ 5, 6). Again, great deference should be given to counsel's trial strategy, including the decision to not call a witness. Since Hernandez alleges that Percel's counsel was aware of the Hernandez's possible testimony (Hernandez Affidavit, ¶ 6), Percel has not shown that counsel failed to investigate to bring this case in line with *Bryant*. Although Percel and Hernandez now allege that Hernandez would have testified on behalf of Percel, counsel did not have the benefits of hindsight and should be judged in light of all the circumstances.

Moreover, on September 14, 2009, Percel used Hernandez's affidavit as the basis for a motion for new trial. (D.E. 449, 450, 455). This Court ultimately agreed with the United States that Percel's motion for new trial was not timely and that Percel was not entitled to relief on the merits, (D.E. 455, 458), as did the Fifth Circuit. (D.E. 510, 511). In rejecting Percel's contention that Hernandez's affidavit was "newly discovered evidence" that would support a motion for new trial, the Fifth Circuit pointedly observed:

> Percel has not shown that his failure to discover Hernandez's potential favorable testimony was not due to his own lack of diligence. Nor has he shown, in light of the other evidence against him, that inclusion of

Hernandez's proffered testimony would probably result in his acquittal at a new trial. Two of Percel's co-defendants offered detailed testimony at trial implicating him in the offense. That testimony was corroborated to a large extent by testimony from DEA agents who conducted surveillance of the defendants on the day of their arrest; by video tapes made during that surveillance; and by items found during searches of the residences involved.

*United States v. Percel*, No. 09-20752, 2010 WL 2546066 (5th Cir. June 22, 2010).

Thus, Percel has failed to demonstrate that he suffered any prejudice, assuming, *arguendo*, that trial counsel's performance had been deficient.

### F.  Percel Has Failed to Demonstrate that Counsel Performed Below the Objective Standard of Competent Counsel in Allegedly Failing to Adequately Prepare Percel to testify in His Own Behalf.

Percel next argues that counsel failed to advise him of the possible consequences of testifying and failed to prepare him to testify. "[T]he decision to put a defendant on the stand is 'a judgment call' which should not be easily condemned with the benefit of hindsight." *United States v. Garcia*, 762 F.2d 1222, 1226 (5th Cir. 1985). Again, "in determining whether counsel's performance was deficient, [the court] must be highly deferential to counsel's trial strategy." *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002). Also, counsel may not prevent a defendant from testifying if he so chooses. *United States v. Martinez*, 181 F.3d 627, 628 (5th 1999). The record shows that on direct examination counsel allowed Percel to present his story to the jury. (D.E. 385).

33

Even if counsel failed to advise and prepare Percel to testify, Percel has failed to prove prejudice.  The evidence mounted against the Percel was enough to convict outside any inference the jury might have made by seeing Percel testify.  *See Comeaux v. Cain*, 204 F. App'x 471, 474 (5th Cir. 2006) (holding petitioner's claim that his attorney provided ineffective assistance by not advising him of potential consequences of testifying did not pass the *Strickland* test because the evidence of his guilt was substantial).

In addition, Percel's allegations are conclusory because he has failed to show how his testimony would have differed or how the outcome would have changed if counsel had advised him differently.  *See LeClaire v. Hofman*, No. 2:09 CV 64, slip op. at 11 (D. Vt. Jan. 26, 2010) (denying petitioner's claim of ineffective assistance of counsel for failing to prepare petitioner to testify because of conclusory allegations).

### G. Percel has Failed to Demonstrate an Individual Instance of Ineffective Assistance of Counsel, so There is No Cumulative Error.

Percel relies on that haggard canard, the cumulative impact of counsel's actions were sufficiently prejudicial so as to deny him due process.  "Ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions."  *United States v. Hall*, 455 F.3d 508, 520-21 (5th Cir. 2006).  As discussed

above, none of Percel's allegations can be considered deficient and prejudicial. Therefore, "'cumulative' error is not grounds for relief." *Id.*

## An Evidentiary Hearing Is Not Necessary

No evidentiary hearing is necessary, as no fact issues are presented. *United States v. Samuels*, 59 F.3d 526, 530 & nn.16-17 (5th Cir. 1995) (citations omitted); *United States v. Bartholomew*, 974 F.2d 39, 41-42 (5th Cir. 1992). If the defendant produces independent indicia of the likely merit of his allegations, typically in the form of one or more affidavits from reliable third parties, he is entitled to an evidentiary hearing on the issue. *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998) (citation omitted). If, however, the defendant's showing is inconsistent with the bulk of his conduct or otherwise fails to meet his burden of proof in the light of other evidence in the record, an evidentiary hearing is unnecessary. *Id.* (citing *United States v. Smith*, 844 F.2d 203,208 (5th Cir. 1988) and *United States v. Raetzsch*, 781 F.2d 1149, 1152 (5th Cir. 1986)). Here, Percel alleges no facts that would warrant an evidentiary hearing under 28 U.S.C. § 2255. *See United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980) (evidentiary hearing not required when § 2255 claims are based on "unsupported generalizations" or allegations that are "conclusory in nature and devoid of sufficient factual substantiation") (citation and internal quotations omitted).

35

### No Certificate of Appealability Should Issue

Percel's motion under 28 U.S.C. § 2255 is governed by the AEDPA.  A certificate of appealability is required before an appeal may proceed.  *See Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282, 124 S. Ct. 2562, 2569 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1603-04 (2000)).  Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336, 123 S. Ct. at 1039.

36

Where the denial of relief is based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484, 120 S. Ct. at 1603-04.   A district court may deny a certificate of appealability, sua sponte, without requiring further briefing or argument.   *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).   Reasonable jurists would not debate whether Percel has stated a valid claim.   A certificate of appealability should not issue.

## Conclusion

Because of the foregoing reasons, Percel is not entitled to the relief sought.   The United States respectfully requests that his petition under 28 U.S.C. § 2255 be dismissed, or in the alternative, that this Court grant summary judgment in favor of the United States.   No evidentiary hearing is necessary and no certificate of appealability should issue.   The United States respectfully requests that the corresponding civil action be dismissed with prejudice.

Filed electronically in Houston, Texas, on August __23__, 2010.


Respectfully submitted,

37

JOSE ANGEL MORENO
United States Attorney

JAMES L. TURNER
Chief, Appellate Division

 /s/ *John Richard Berry*
John Richard Berry
Assistant United States Attorney
Southern District of Texas
919 Milam Street, Suite 1500
Houston, Texas 77002
Telephone: 713-567-9506
Facsimile: 713-718-3302
E-mail: richard.berry@usdoj.gov

## CERTIFICATE OF SERVICE

I, Assistant United States Attorney John Richard Berry, certify that a true and correct copy of the attached pleading was served by placing same in the United States mail, postage prepaid, on August ___23___, 2010 , addressed to:

> Sugentino Percel
> Reg. No. 39433-179
> F.C.I. Loretto
> Federal Correctional Institution
> P.O. Box 1000
> Loretto, Pennsylvania  15940
> Telephone:  814-472-4140
> Facsimile:  814-472-6046

 /s/ *John Richard Berry*_____
John Richard Berry
Assistant United States Attorney

39