IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-06-89-4 |
| | § | CIVIL ACTION NO. H-10-1394 |
| SUGENTINO PERCEL, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28

U.S.C. § 2255 is Movant Sugentino Percel's § 2255 Motion to Vacate, Set Aside or Correct

Sentence (Document No. 499),[1] and Memorandum in Support (Document No. 500), the United

States' Response and Motion to Dismiss (Document No. 518), Movant's Response to the

Government's Response (Document No. 526), the Affidavit of Mr. Ivan Lopez de Victoria

(Document No. 534),[2] Supplemental Brief (Document No. 540),[3] and Sworn Affidavit of

---

[1] Sugentino Percel's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-10-1394 and at Document No. 499 in Criminal Action No. H-06-89. References hereafter will be to the Criminal Document numbers unless otherwise indicated.

[2] The undersigned Magistrate Judge ordered Movant's trial counsel, Ivan R. Lopez de Victoria, to submit a sworn and signed affidavit, addressing the issues raised in Movant's § 2255 Motion. (Document No. 530). In response to the Court's Order, Mr. Lopez de Victoria filed his affidavit on March 2, 2011 (Document No. 530). It is ORDERED that the record is expanded to include the affidavit of Movant's counsel.

[3] Movant has moved to file a Supplemental Brief, in which he responds to the contents of the Affidavit filed by his trial counsel. (Document No. 540). To the extent that Movant seeks to respond to the contents of Mr. Lopez de Victoria's affidavit, through his supplemental brief and to amplify and elaborate on his ineffectiveness of counsel claims and not to assert new allegations, his request is well taken. It is ORDERED that the motion is GRANTED and the

Yohanny Perez (Document No. 542).  After reviewing Movant's § 2255 Motion, Memorandum

in Support, the Government's Response and Motion to Dismiss, the Affidavits, Movant's

Supplemental Brief, the record of the proceedings before the District Court in the underlying

criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the

reasons set forth below, that the Government's Motion to Dismiss (Document No. 518) be

GRANTED, and that Movant Sugentino Percel's  § 2255 Motion (Document No. 499) be

DENIED.


## I.      Procedural History

Movant Sugentino Percel ("Percel"), who is currently in the custody of the United States

Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255.  This is

Percel's first attempt at § 2255 relief.

On March 21, 2006, Percel, along with Juan A.  Escobar, Leon Baldomero DeLeon, Eric

Vasquez, Jesus Alejandro Osorio, Leonardo Arcemio Garcia, Bonifacio Hernandez, and German

Arias, was charged by Indictment with drug trafficking activities.  In particular, Percel was

charged with conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in

violation of 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(A)(ii) (Count one), and possession with

intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) &

841(b)(1)(A)(ii), and 18 U.S.C. § 2 (Count two).  (Document No.  22).  The docket sheet shows

that Percel was represented by Mr.  Ivan R.  Lopez de Victoria, who he had retained. Following a

---

record is expanded to include Movant's Supplemental Brief, including the Affidavits submitted
therewith and the sworn Affidavit of Yohanny Perez.  (Document Nos. 541, 542).

four-day trial, Percel was found guilty on both counts on November 20, 2006.  (Document No. 193).  Testifying at the trial were the various law enforcement officers that investigated the drug trafficking activities charged in the Indictment.  In addition, two co-defendants, German Arias and Leon Baldomero DeLeon, testified.  Following his conviction, Percel and co-defendant, Eric Vasquez, moved to substitute attorney Steven Jay Rozan, for their respective attorneys. (Document No.  200).  In connection with this request, Percel filed a Waiver of Conflict. (Document No.  206).  Judge Harmon granted Percel's request. (Document No.  209).

Prior to sentencing, a pre-sentence investigation report ("PSR")  was prepared, to which Percel filed written objections.[4]  (Document Nos.  256.  258, 279).  Pursuant to the PSR, Percel's advisory guideline sentencing range was calculated as follows:  (1) Percel had a base offense level of 34 under U.S.S.G. § 2D1.1(c)(3).[5]  (2).  With a total offense level of 34, and with a criminal history category of I, Percel had an advisory guideline sentence range 151 to 188 months. On March 16, 2007, Percel was sentenced to a term of imprisonment of 151 months, a 5 year term of supervised release, a $200 special assessment, and a fine of $17,500.  (Document No. 281, Transcript of Sentencing Hearing, Document No. 397, pp.  8-10).  Judgment was entered on March 28, 2007.  (Document No.  302).  With respect to Percel's sentence, Judge Harmon stated:

Mr.  Percel is a 37-year-old naturalized citizen originally from the Dominican

---

[4] Percel  objected to PSR ¶ 19, which had no impact on the calculation of his guideline sentence.  (Document No.  279.)

[5] According to ¶ 40 of the PSR, Percel declined to be interviewed by Probation Officer. The PSR states: "the defendant has contested the charges against him and was found guilty after a trial.  He declined to make a statement when interviewed for this report, in the presence of counsel, on December 18, 2006, at the Federal Detention Center, Houston, Texas.

Republic.  He was involved in a multi-kilogram cocaine trafficking conspiracy for which he was arrested in Houston and tried and found guilty by a jury.

Mr.  Percel has no ties to Texas, yet this is the second time he has been arrested in the Southern District of Texas for drug activity; the other time in Corpus Christi in 1998.  He has been in the United States at least since 1993 and has resided mostly in Milwaukee, Wisconsin.  He's also had some contact in New Hampshire and Massachusetts.  Nevertheless, he has never been convicted of any crime until this conviction.

There are many unanswered questions concerning his background, including his work, residence and financial history, the use of aliases and travel between and ties to three states, not particularly close geographically to each other, that is, Wisconsin, Massachusetts and Texas.

I believe, nonetheless, that a sentence at the low end of the guideline range will sufficiently accomplish the goals of 18 United States Code, Section 3553(a), including punishment, deterrence and protection of the public.  I have considered the guidelines and find that a guideline sentence does accomplish the goals of 18, United States Code, Section 3553(a).  (Document No.  397, p.  7-8).

Percel, along with his co-defendant Vasquez, appealed their convictions to the Fifth

Circuit Court of Appeals.  (Document No.  286).  On appeal, Percel argued (1) that the district

court committed reversible plain error in its oral jury instruction when it omitted the word "not"

in stating that "no inference whatever may be drawn from the election of a defendant to testify"

and (2) that the district court erred in permitting Arias to testify regarding a previous drug

transaction in which Percel, Vasquez, and Arias participated.  The Fifth Circuit, unpersuaded by

all the arguments raised by Percel and Vasquez, on December 23, 2008, affirmed their

convictions.  (Document No.  425); *United States v.  Percel*, 553 F.3d 903 (2008).  The Fifth

Circuit summarized the evidence presented at the four day trial as follows:

Percel's and Vasquez's arrests resulted from a surveillance operation conducted by a agents of the Drug Enforcement Agency (DEA).  That operation began with surveillance of two addresses in Harris County, Texas — 7430 Weatherhill and 7622 Lima.  Agents observed a meeting between three of the suspects, Juan

4

Antonio Escobar, Leon Baldomero DeLeon, and Bonifacio Hernandez, at Bravos Restaurant.  The agents then saw Escobar and DeLeon drive to 7430 Weatherhill, load a Ford Explorer parked outside the home with a heavy-looking black duffle bag (which agents later discovered contained a money counter) and several black plastic bags containing brick-shaped objects, and drive the Explorer to another house at 8915 Alejo, where Escobar and DeLeon unloaded the bags.

Escobar then left DeLeon at the home and met with Hernandez, Percel, and German Arias in the parking lot of Bravos.  The four returned to 8915 Alejo in the Explorer, where the DEA agents observed Percel and Arias carrying black bags into the house.

Escobar left the home again, leaving Percel and Arias there, and drove to an AutoZone to buy canned axle grease.  He then picked up Jesus Alejandro Osorio and Vasquez at 3737 Watonga and drove them to 8915 Alejo, where the three stayed for approximately fifteen minutes before returning to 3737 Watonga.  Upon returning to 3737 Watonga, Vasquez and Osorio got into a minivan with Illinois license plates, and Vasquez drove the minivan back to 8915 Alejo, followed by Escobar in his Explorer.  Vasquez parked the minivan in the garage, which was quickly closed, and Escobar parked the Explorer in the driveway and entered the home.

About an hour later, Escobar exited the home and drove the Explorer out of the driveway.  The garage door then opened and Arias drove the minivan out of the garage and onto the street, with Osorio in the passenger seat.  The minivan and the Explorer drove off in tandem toward Bingle Road.

Five minutes later, a Harris County Sheriff's Department patrol unit stopped the minivan on Bingle Road traveling in the direction of the 3737 Watonga residence.  The unit searched the minivan and found ten kilograms of cocaine hidden in the right rear quarter panel.  The cocaine was packed in one-kilogram bricks that were wrapped in two layers of cellophane with a layer of grease or menthol in between and enclosed in a vacuum-sealed bag to conceal the odor from drug-detection canines.

While the minivan was stopped, Escobar circled his Explorer around and headed back to 8915 Alejo.  Escobar stopped near the driveway, and agents observed Hernandez, DeLeon, Percel, and Vasquez exit the house and get into the Explorer, which sped away, going sixty miles per hour in a thirty-mile-per-hour speed zone and running red lights and stop signs.  Agents stopped the Explorer near 3737 Watonga and took its passengers out of the Explorer.

After these stops, the agents conducted searches of the three addresses

surveilled— 3737 Watonga, 8915 Alejo, and 7430 Weatherhill.  At 3737 Watonga, they found industrial-sized green cellophane and vacuum-sealing bags identical to those used on the cocaine bricks found in the minivan.  Both items contained cocaine residue on them.  The agents also found a small scale and some bags with cocaine residue in the kitchen.

In the kitchen at 8915 Alejo, the agents found a heat-sealing machine and materials consistent with those used to wrap the cocaine bricks, including grease, rubber gloves smeared with grease, and green cellophane.  The agents also found a tool set that they believed was used to remove and replace the panel in the minivan.  In the front bedroom, the agents found two plastic bags with twenty-five kilograms of cocaine wrapped in the same manner as the cocaine found in the minivan.

At 7430 Weatherhill, the agents found a number of scales, plastic bags, a vacuum-sealing machine, green cellophane, $47,000 in cash, a semi-automatic handgun, and eight kilograms of cocaine.  The agents also found a white Dodge pickup truck with a hidden compartment behind the cab area that would have held approximately fifty kilograms of cocaine.  The truck belonged to Leonardo Garcia, who was present at the home during the search.

Percel, Vasquez, Osorio, Hernandez, Escobar, DeLeon, Garcia, and Arias were arrested and charged.  Hernandez, Escobar, DeLeon, Garcia and Arias all pled guilty to at least one of the charges.  Percel, Vasquez, and Osorio were tried together and each convicted by a jury on both counts.  Percel and Vasquez were sentenced to 151 months imprisonment, followed by 5 years supervised release, and a mandatory special assessment of $200, a fine of $17,500.

At the trial, DeLeon and Arias testified against the defendants as part of the terms of their plea agreement.  DeLeon testified that he sold thirty-five kilograms of cocaine to Osorio and Hernandez, who in turn sold it to Percel, Vasquez, and Arias.  According to DeLeon, on the night in question, he and Escobar brought the cocaine from 7430 Weatherhill to 8915 Alejo, where everyone, including Percel and Vasquez, helped package the cocaine.  DeLeon also stated that Vasquez, Percel, and Arias concealed the cocaine in the minivan when it was brought into the garage.

Arias testified that he had been close friends with Percel for twenty-eight years and had known Vasquez for approximately seven years.  According to Arias, Percel and Vasquez made arrangements for him to come to Houston from New York with a minivan to buy drugs.  Arias stated that he was taken to 8915 Alejo, where he saw cocaine and took part in packaging the cocaine, along with Percel and Vasquez.  Arias also testified that Vasquez drove the minivan into the garage

of the house and that Arias helped Vasquez and Percel hide the cocaine in the panel of the minivan.

Additionally, Arias testified about a similar prior drug deal involving himself, Percel, and Vasquez.  According to Arias, in December 2005 or January 2006, he drove a rented van from New York to Houston, where Percel and Vasquez helped him conceal fifteen kilograms of cocaine in the van.  Arias then handed the van off to a man and women who drove it to Boston.  Arias received $5,000 for his trip.

Prior to trial, the Government filed a notice of intent to offer evidence of this previous drug transaction, and the district court ruled that such evidence was admissible under Federal Rule of Evidence 404(b).  After Arias gave the testimony, the court gave a limiting instruction to the jury, telling them that they "must not consider any of this evidence in deciding if the Defendants committed the acts charged in the indictment" but could only consider it to determine whether the defendants had the state of mind or intent necessary for the crime charged, had the motive or opportunity to commit the acts charged, acted according to plan, or committed the act by accident or mistake.

Percel testified on his own behalf, while Vasquez declined to testify.  Percel claimed that he was in Houston with a friend to visit the friend's relatives.  Percel testified that he believed he was going to a party with Vasquez and Hernandez at the Alejo house.  According to Percel, he never went into the kitchen or the garage of the house, never saw any cocaine, and never saw the minivan at the Alejo house.  Instead, he remained in the living room, where he watched TV, played dominoes, and drank some beer.  He also denied involvement in the cocaine transaction.  (Document No. 425, pp. 2-5).

With respect to Vasquez and Percel's challenge to the jury instruction, the Fifth Circuit wrote:

When instructing the jury at the close of evidence, the judge stated, "The law does not require a defendant to prove his or her innocence or produce any evidence at all and no inference whatever may be drawn from the election of a defendant to testify."  The instruction to which the parties agreed stated that "no inference whatever may be drawn from the election of a defendant *not* to testify."  Neither side raised any objections to the erroneous instruction when given, and the written instructions sent to the jury room contained the proper language.

The first issue Percel and Vasquez raise on appeal is whether the district court committed reversible plain error in its oral jury instructions when it omitted the word "not" in stating that "no inference whatever may be drawn from the election of a defendant to testify."  Generally, incorrect jury instructions are not considered

structural errors, and because neither Percel nor Vasquez objected to the jury instruction in the district court, we review the instruction for plain error.  A jury instruction is plain error if "(1) it was erroneous; (2) the error was plain; and (3) the plain error affected the substantial rights of the defendant."  This court has discretion to correct plain error where "the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  The proper inquiry on plain error review "is not whether the instruction 'could have' been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury *did* so apply it."

Percel, who testified at trial, appears to argue that by instructing the jury that "no inference whatever may be drawn from the election of a defendant to testify," the district court prevented the jury from making any inferences based on the content of his testimony.  However, it is unlikely that the jury would have interpreted the instruction in such a way.  At most, the instruction prevents the jury from drawing any inferences from Percel's *election to testify*, not from the substance of the testimony itself.  Even if the instruction were interpreted as Percel contends, the judge later instructed the jury that it was permitted to draw reasonable inferences from the testimony of witnesses and that the defendant's testimony should be weighed just like any other witness.  Thus, the district court's jury instruction was not plain error as to Percel.

Vasquez, who did not testify, argues that the instruction violated his Fifth Amendment right against self-incrimination because it allowed the jury to draw an inference of guilt from his failure to testify.  A criminal defendant has a Fifth Amendment right for a judge, upon the defendant's request, to instruct a jury not to make any adverse inferences based on the defendant's election not to testify.  Vasquez requested a "no-adverse-influence" instruction and the court agreed to give it.  However, because the judge omitted the word "not" in [her] oral instructions, the instruction was error.

However, the judge's error was not plain error because the omission of the word "not" in the jury instruction, when viewed in light of the entire trial, did not seriously affect the trial's fairness or integrity.  The effects of the judge's omission in his oral instructions were mitigated by the fact that the written instruction sent into the jury room contained the correct wording.

Moreover, at the beginning of the trial, during voir dire, the judge correctly instructed the potential jurors that the burden was on the Government to present the evidence in the case and "if [the defendants] don't testify or put on any evidence, you cannot hold that against them as some indication of evidence.  You can't require them or expect them to explain themselves or put on any evidence."  The judge further explained that "there are reasons why in a criminal trial, which

8

is completely different from any other situation in the whole world, ... a person might not want to get up on the stand and explain themselves or tell you his side of the story.  The law requires that you, as a juror ... to say, [']Okay, that's fine, I'm not going to hold that against him.[']"

Given that the jury was properly instructed during voir dire and had access to the correct instruction during its deliberation, there is not a reasonable likelihood that the jury would have applied the judge's erroneous oral instruction unconstitutionally.  The omission does not constitute plain error.  (Document No. 425, p.  5-8) (emphasis in original) (footnotes omitted).

In addition to rejecting Percel's jury instruction claim, the Fifth Circuit found no error by the

District Court in allowing Arias to testify about a previous drug transaction.  The Fifth Circuit

wrote:

Percel asserts that the district court erred in permitting Arias to testify regarding a previous drug transaction in which Percel, Vasquez, and Arias participated.  The district court permitted the testimony under Federal rule of Evidence 404(b), which allows evidence of "other crimes, wrongs, or acts" for the purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  A district court's admission of Rule 404(b) evidence is subject to reversal only upon a clear showing of abuse of discretion.

Under *United States v.  Beechum*, this circuit applies a two-pronged analysis for the admissibility of evidence under Rule 404(b).  First, the evidence of "other crimes, wrongs, or acts" must be relevant to an issue other than the defendant's character.  The standard of relevance under Rule 401, which deems evidence relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," applies in this first prong analysis.  Furthermore, evidence in the 404(b) context "is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor."  Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice.

This court previously affirmed the district court's admission of the same evidence at issue here against Osorio in a separate appeal.  The Government argues that because the Rule 404(b) issue raised by Osorio in his appeal is identical to the issue raised by Vasquez and Percel here, our previous disposition of the matter should control.

9

Like Vasquez and Percel, Osorio challenged the admission of the evidence by asserting that there was insufficient proof that he participated in the prior drug transaction.  Unlike Arias's testimony with respect to Percel and Vasquez, however, Arias did not testify that Osorio arranged the drug transaction, participated in it, or knew that it took place.  Arias only testified that Osorio was present when four other individuals packaged and removed cocaine from Osorio's apartment.  Because the testimony at issue in Osorio's appeal and the testimony at issue here differ in ways that alter the relevance inquiry, the resolution of the admissibility of Arias' testimony in Osorio's case is not dispositive.  Nevertheless, our inquiry under Rule 404(b) leads us to the same result.

The district court properly applied the *Beechum* test in admitting Arias's testimony.  The district court held that the evidence was offered for a purpose other than proving the defendants' bad character:

> Certainly evidence that some months before the commission of the crime alleged in the indictment, the three defendants took virtually identical actions to accomplish the transportation and delivery of multiple kilograms of cocaine would be probative of the defendants['] intent, motive, opportunity, preparation, plan, knowledge, and absence of mistake or accident in the crimes for which they were on trial.

The district court further held that the probative value of the evidence was not substantially outweighed by the risk of unfair prejudice, given the necessity of the evidence for the Government's attempt to prove that the defendants possessed the requisite intent.  To minimize the risk of unfair prejudice, the district court instructed the jury at trial not to consider this evidence for determining whether the defendants committed the acts charged but only for determining whether the defendants had the requisite state of mind.

Percel argues that the Government did not present sufficient evidence to prove that Percel actually engaged in this past drug deal.  Percel bases this argument on the fact that Arias was a cooperating witness and thus lacked credibility.  Again, the jury was fully capable of weighing Arias's credibility, and Arias's testimony was enough for the jury to reasonably conclude that Percel engaged in the past drug deal.

Percel also argues that the probative value of Arias's testimony was substantially outweighed by the risk of unfair prejudice.  The Government argues that, given the similarities between the two drug transactions, the evidence was highly probative as to intent.  Further, the Government argues that the district court's jury instructions minimized the risk of unfair prejudice.  Given the probative value of

the evidence and the mitigating effect of the jury instructions, the district court did not clearly abuse its discretion in permitting Arias's testimony under Rule 404(b). (Document No. 425, p. 12-13).

Percel filed a petition for writ of certiorari with the United States Supreme Court, which was denied on April 27, 2009. (Document No. 442); *Percel v. United States*, 129 S.C. 2067 (April 27, 2009). As such, Percel's judgment and conviction became final on April 27, 2009.

The docket sheet reveals that on September 14, 2009, Percel filed a Motion for New Trial Pursuant to Fed. R. Crim. P. 33 (Document No. 449, 450), in which he argued that he had newly discovered evidence, namely a sworn statement from Bonifacio Hernandez, in which Hernandez stated that Percel did not participate in the conspiracy. Judge Harmon denied the Motion. (Document No. 458). Percel appealed the denial to the Fifth Circuit Court of Appeals. (Document No. 462). The Fifth Circuit affirmed the denial on June 22, 2010. (Document No. 509, 510); *United States v. Percel*, 383 Fed.Appx. 417 (5th Cir. 2010). The Fifth Circuit wrote:

> Sugentino Percel, federal prisoner #39433-179, was convicted of conspiring to possess with the intent to distribute and aiding and abetting the possession with the intent to distribute, five kilograms or more of cocaine. His conviction was affirmed on appeal. *United States v. Percel*, 553 F.3d 903, 906 (5th Cir. 2008), *cert. denied*, *Vasquez v. United States*, 129 S.Ct. 2065 (2009). He now appeals the district court's denial as untimely of his post-appeal motion for a new trial. He alleged that his motion was based on newly discovered evidence consisting of a statement from a non-testifying codefendant, Bonifacio Hernandez, indicating that Percel did not participate in the offense of which he was convicted and had no knowledge of the cocaine.
>
> Even if this court assumes that the motion was based on newly discovered evidence and was timely filed, Percel cannot show that he is entitled to a new trial. A defendant moving for a new trial must establish that: (1) the evidence is newly discovered and was unknown to him at the time of trial; (2) the defendant's failure to discover the evidence was not due to a lack of diligence; (3) the evidence is material, not merely cumulative or impeaching; and (4) the evidence would probably produce acquittal at a new trial. Percel has not shown that his failure to discover Hernandez's potential favorable testimony was not due to his own lack

of diligence.  Nor has he shown, in light of the other evidence against him, that
inclusion of Hernandez's proffered testimony would probably result in his
acquittal at a new trail.  Two of Percel's co-defendants offered detailed testimony
at trial implicating him in the offense.  That testimony was corroborated to a large
extent by testimony from DEA agents who conducted surveillance of the
defendants on the day of their arrest; by video tapes made during that surveillance;
and by items found during searches of the residence involved.

The U.S. Supreme Court denied Percel's request for certiorari on November 1, 2010.  (Document

No.  528); *Percel v.  United States*, 131 S.Ct.  544 (2010).

On April 26, 2010, Percel timely filed a § 2255 Motion to Vacate, Set Aside, or Correct

Sentence (Document No.  499) and a Memorandum in Support (Document No.  500).  In his

§ 2255 Motion, Percel raises claims of ineffective assistance of counsel.  According to Percel, his

trial counsel was constitutionally ineffective for failing to interview German Arias and Bonifacio

Hernandez.  Percel next alleges that counsel was ineffective for failing to advise him as to the

effect of the Guidelines and how his sentence would be calculated "thus rendering his plea

involuntary."  According to Percel, counsel failed to advise him about relevant conduct, and in

particular, how drug quantities could be used to calculate his sentence.  Similarly, Percel claims

that counsel failed to explain the sentencing benefits of accepting responsibility and how that

could impact the calculation of his guideline sentence.  Percel contends that "had counsel

properly taken the time to advise [him] how the relevant conduct portions of the sentencing

guidelines applied to his case, [he] would have accepted a plea of guilty and would have

ultimately resulted in a reduced guideline range that would have included a safety valve sentence

reduction.  (Document No.  500, page. 9).  Percel maintains he would have been willing to make

a statement in order to get a sentencing benefit under the guidelines.  Percel next alleges that

counsel was constitutionally infective for failing to object to the "improper jury instructions that

allowed the jury to draw an inference on [his] fifth amendment silence during the jury

instruction." Percel further alleges that counsel was ineffective for failing to prepare him to

testify at trial. Percel argues that counsel failed to advise him that the jury might not believe his

testimony and that he would suffer the repercussion should his trial testimony not be believed

and he was found guilty. Finally, Percel claims that the cumulative impact of trial counsel's

errors require him to be re-sentenced and/or an evidentiary hearing held.

  In support of his ineffective assistance of counsel claims, Percel has submitted several

affidavits. An affidavit from co-defendant German Arias states in pertinent part:

> On February 21, 2006, I was arrested in Houston, Texas, where I believe that the
> Agents violated my rights when stopped [sic] the rented vehicle. I was driving the
> vehicle and they used the excuse that [sic] was missing the sticker in my license
> plate, however, they never gave me a ticket and took the vehicle. Without me
> giving them permission they started looking inside the vehicle and they did not
> bring an interpreter. I do [not] speak [E]nglish. After two or three times looking
> inside the car, they found 10 kilos of cocaine. Eventually, I spoke with an
> attorney named IZGUIRRE who told me that they wanted me to plead guilty and
> cooperate with the government so I would get less time in jail not be deport [sic]
> to my country.
>
> I signed the agreement to plead me guilty and met the prosecutor, the agents and
> my lawyer. They asked me to testify against Eric Vasquez and Sugentino Percel
> in their case if they do not accept guiltiness. I told my lawyer that I could not
> testify against these people because they were not involved in this crime that I
> committed.
>
> Then they told me that I had signed the agreement already and if I refused to
> testify against these people, they could send me 15 to 20 years in jail, perjury
> charges and deport me to my country.
>
> I want to clarify that both Sugentino Percel and [Eric] Vasquez are not involved in
> this crime, when they were arrested in Houston Texas on February 21, 2006, and
> they did not help me wrapping the kilos of cocaine at any time or helped me place
> it in the car. They had no knowledge of what I was doing because I wast [sic]
> most of the time in the bedroom of the house located in Alejo Street where they
> found 25 kilos of cocaine while Vazquez and Percel were in the living room

watching television, playing dominoes and drinking beer.  Then with the pressure I felt on the part of the lawyer, the prosecutor and the agents I fell in a big nervous breakdown, the doctor went to visit me and gave me some medication.  My lawyer, the prosecutor and the agents knew about this all the time, but after the meetings with the prosecutor and the agents my nervous breakdown was stronger so I took more pills that the doctor gave me for the day when I went to testify at trial, I kept those pills for me for those moments of depression.

I agreed to sign the agreement with the government, but not all was completely clear for me, if I had known I had to testify against Vasquez and Percel I would never have done it, I told this to my lawyer in advance but he fooled me.

I also want to clarify that I testified at the trial that Vasquez and Percel were making a transaction of 15 kilos of cocaine in November or December 2005 and January 2006 but that never happened, that was not true, what happened was that in one of the meetings with the government they were pushing me too much for me to say when I had made another drug transaction and I told them that in November 2005 Percel, Vasquez and me made a transaction of 15 kilos of cocaine, but that was not true, then before I take the trial to testify, the prosecutor sent a message to my lawyer and asking me to say in the court that the transaction of the 15 kilos was made in December or January 2005 instead than November because he realized that Percel was not in United States in November 2005.

I want to clarify that the person who did me the favor of renting the car in which I arrested was Luz Alvarado which was my friend, she lived in New York and I invited her to Houston, but she had no knowledge that I was doing illegal business.  I lied to her.  I am willing to pay for those mistakes that I made and testify in the court of the United States if they require to do me so.  (Document No. 500, p. 36-38).

In addition to Arias' affidavit, Percel submitted the affidavit of Bonifacio Hernandez.  This is the same affidavit that Hernandez previously submitted to the Court in connection with his Motion for New Trial.  In his affidavit, Hernandez states in part:

3.  Upon my arrest, I advised my attorney, David Adler, that individuals arrested in my case had no relationship to the charges and were no way involved with me in any crime.  I also advised my attorney that those individuals (Mr. Percel ) had no knowledge of my criminal activities.

4.  I specifically advised Mr.  Adler, my attorney, that neither co-defendants, Sugentino Percel nor Eric Vasquez, were involved in the crimes in which I was

14

charged, nor did they have any knowledge of any drugs that were in my sole possession.

5.  On more than one occasion I made a specific request that my attorney, Mr. Adler, fully inform the prosecutor that I was ready to testify for the defense of both co-defendants.  Specifically that I was aware that they had no knowledge nor were they participating in my criminal acts.

6.  Although my attorney never presented my information to the prosecutor on behalf of Mr. Percel and Mr. Vasquez, I understood that my attorney, Mr. Adler, did discuss my willingness to testify for the defense of Mr. Percel and Mr. Vasquez in the trial.

7.  Once again, I asked my attorney, Mr. Adler, to notify the attorneys for Mr. Percel and Mr. Vasquez that I was available and ready to testify on the behalf of their clients.

8.  Although I requested, on numerous occasions, that I be allow[ed] to testify to both Mr. Percel and Mr. Vasquez, unfortunately they are being punished and sentenced for crimes that they did not commit.  Neither did they have any personal knowledge of the crimes that they were charged with.

9.  It is through my sworn affidavit that I present to the Court, that if offered to testify at any hearing or at any subsequent trial, that I will provide direct testimony of my involvement, material to the charged offense, and I will provide exculpatory information relating to both Mr. Percel and Mr. Vasquez as to their non-involvement in the charged offense. Both Mr. Percel and Mr. Vasquez are innocent of the charged crimes. (Document No. 500, p. 41-43).

Finally, Percel submitted his own affidavit, in which he elaborated on his ineffective assistance

of counsel claims.  Percel's affidavit states in part:

2.  At no time during my pre-trial preparation, did my attorney ever explain to me the repercussions of the guidelines, the application of the guidelines relevant conduct, nor the application of the guidelines acceptance of responsibility sections.  In fact, I had very little conversations with my attorney at all regarding my pretrial preparations.  Had he taken a minimal amount of time to explain to me the repercussions of the guidelines, I would have never proceeded to trial.

3.  There was never any discussion that uncharged drug quantities would ever be applied to my sentence at any stage.  There was never any explanation of the acceptance of responsibility portions of the guidelines.

15

4.  Had counsel taken the opportunity to explain to me the guidelines in even the most basic term, I would have never proceeded to trial.  At all stages I was under my attorney's directions and advice.  Had counsel explained to me the acceptance of responsibility calculations of the guidelines, I would have never proceeded to trial and would have avoided a lengthy term of incarceration.

5.  I had never heard the application of the guidelines prior to my sentencing day.

6.  I was never explained the concept of "safety valve" and how it would have reduced my sentence considerably.  There was just no explanation of the guidelines even in the most basic fashion.

7.  During my pre-trial preparation, I advised my attorney to interview two of the Government witnesses to verify that their stories were being coerced.  I basically begged my attorney to interview Bonifacio and Arias since I was assured that they did not want to testify as they did and that they wanted to present the truth to counsel.

8.  I was assured by counsel that the Government's discovery was sufficient and that it was not required to interview [Bonifacio] and Arias.  Counsel was instructed to interview them on several occasions, however, he refused to do so as requested.

9.  Both witnesses had information that was useful to my defense in my case, but the information was not presented due to counsel's failure to prepare and call the witnesses.

10.  At no time prior to allowing me to testify, was I ever prepared for the testimony I was to present during the trial.  There was no preparation of the testimony to present[,] no review of the testimony[,] and no review of my demeanor.

11.  I felt that I was not prepared to testify.  I was just not ready to testify and I had no idea how the Federal court would receive my testimony.  I was just plain unprepared since my attorney failed to assist me at this stage.

12.  At all stages I relied on counsel's advice and was under the impression that counsel was preparing for my defense.

13.  Counsel even failed to meet with me at the jail prior to my trial to advise me on the status of the guidelines, nor advise me on the status of the interviews of the witnesses I requested on several occasions.

14.  It was not until my trial, that I realized that counsel had not done as I requested and interviewed the witnesses.

15.  I relied on my attorney to represent me accurately at all stages.  (Document No. 500, pp. 44-46).

The Government, in its Motion to Dismiss (Document No. 518), argues that Percel's § 2255 Motion to Vacate, Set Aside or Correct Sentence should be dismissed because Percel is not entitled to relief.  According to the Government, Percel has not shown that his counsel was deficient nor has he shown that he was prejudiced.

Because Percel raised allegations of ineffective assistance of counsel, the undersigned Magistrate Judge ordered Percel's trial counsel to respond to Percel's claims of ineffective assistance of counsel.  (Document No. 530).  Pursuant to the Court's January 27, 2011, Order, Mr. Ivan R. Lopez de Victoria submitted a sworn and signed affidavit.  (Document No. 534). Mr. Lopez de Victoria states in pertinent part as follows:

> After I was retained by Sugentino Percel, I met several times with the U.S. Attorney to review the evidence and discuss the elements of the crime committed by Percel.
>
> Prior to the trial, I explained [to] Mr. Percel about the rules of evidence, and among them I emphasized that under the Federal law the judge would sentence him taking into consideration his relative conduct, including be[ing] charged with all quantities found during the drug interdiction process and that any uncharged portion of the alleged drug quantity could be used to calculate his sentencing range.
>
> Immediately after the U.S. Government informed me that one of the co-defendants was going to testify against Mr. Percel, I conferred with him and explained to him that that would be the factor that would tie him down to the elements of the crime.
>
> The U.S. Attorney offered us 48-month imprisonment trying to make Mr. Percel plea[d] guilty to the count of conspiracy.  Immediately after receiving the offer I related it to Mr. Percel and explained [to] him the Sentencing Guidelines, about

17

the acceptance of responsibility and safety valve provisions and the advantages of pleading guilty, specifically that since he did not have any prior criminal record, he could benefit from the provisions and qualify for the 48-month imprisonment with the recommendation of the U.S. Government.  Percel was also explained that the minimum on a conspiracy charge is 10 years of imprisonment.

During the multiple conferences I had with Mr.  Percel, I told him that he would really benefit from the offer made by the U.S. Government for a Plea Agreement and 48 month imprisonment.  I pointed out that he had 4 small children and that if he would Plea he would have the chance to raise them.  But that if he would go to trial he was looking at 120-month imprisonment.  That by the time he had served his children would have been all grown up.  When the U.S. Government made the offer Percel had already served more than a year and I pointed out that if he would have accepted the offer he would have already done more than 25% of the 48 months.

I discussed his case with his wife, from whom he had two children and she requested me to try to convince Mr.  Percel to plea guilty.

I discuss the case also with his girlfriend Johanny, with whom he had other two children, she also asked me to convince Mr.  Percel to plea guilty.

I discussed the case with one of his friends and his friend requested me to convince Mr.  Percel to plea guilty.

I also discussed the case with Mr.  Percel's brother and he also asked me to convince Mr.  Percel to plea guilty.

I related to Mr.  Percel his family and friends' opinions and concerns but Mr. Percel is a very stubborn person.  We also discussed several times about the possible testimony of his co-defendants and that the Government had assured me that they would have used their testimony against him during trial.  Mr.  Percel assured me always that none of the co-defendants would have taken the stand against him.  Mr.  Percel never believed what I was telling him about what the U.S. Government had informed me.

I conferred  with the Assistant U.S. Attorney and asked him that I wanted to interview Bonifacio Hernandez and German Arias but I was told that they had refused to talk to me and I was informed by the Assistant U.S. Attorney that the co-Defendant's were debriefed in the presence of their own attorneys at their own free-will and also testified in open-court, and at none of these statements they declared that they were being coerced into providing testimony for the Government.

Prior to trial Arias' wife telephone called my office and my Paralegal informed me that Arias' wife left a message that he was going to testify against Percel and that it would be a good idea for him to plea.  I related the information of Percel.

Percel decided to go to trial against my advise.  Even though I advised him about the risks of testifying on his own behalf, he decided to testify against my advice.  Prior to trial I prepared Mr.  Percel to testify and once more time I advised him about the risks of testifying on his own behalf and the benefits of a plea but he decided to go to trial anyways and testified and the result was that he was found guilty of Counts One, and [Two] of the Indictment.  (Document No.  534, p.  1-2).

Percel was provided a copy of counsel's affidavit.  Percel responded to the contents of Mr.

Lopez de Victoria's affidavit with his own affidavit as well as from family and friends.

(Document No.  541).  The gist of the affidavits submitted by Percel in response to counsel's

affidavit relate exclusively to counsel's statement that the Government had offered a 48 month

term of imprisonment.  The Affidavits unequivocally state that Mr.  Lopez de Victoria had not

discussed with Percel, Percel's family or friends, the Government's offer of  48 month term of

imprisonment. This § 2255 proceeding is ripe for ruling.


**II. Discussion**

Claims of ineffective assistance of counsel are generally measured by the standard of

*Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must be able to

show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair

trial could not be had.  *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective

reasonableness standard, with great deference given to counsel and a presumption that the

disputed conduct is reasonable.  *Id*. at 687-88.  The prejudice element requires a petitioner to

prove that absent the disputed conduct of counsel, the outcome would have been both different

and more favorable. *Id*. at 694-95. Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S.

20

at 690.  "We will not find inadequate representation merely because, with the benefit of

hindsight, we disagree with counsel's strategic choices."  *Kitchens v. Johnson*, 190 F.3d 698, 701

(5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).  Conclusory

allegations of ineffective assistance of counsel do not raise a constitutional question in a federal

habeas petition.  *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849

(2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d

1008, 1012 (5th Cir. 1983)).

 The United States Supreme Court in *Harrington v.  Richter*, ___U.S.___, 131 S.Ct.  770,

778 (2011) recently discussed *Strickland* in the context of a state habeas proceeding.  While

*Harrington* did not involve a federal habeas proceeding, the Court's discussion of *Strickland* and

ineffective assistance of counsel claims is instructive and equally applies to claims brought in a

federal habeas proceeding such as those raised herein by Percel.

 With respect to ineffective assistance of counsel claims, the Court observed that "[t]here

are, [ ] 'countless ways to provide effective assistance in any given case.  Even the best criminal

defense attorneys would not defend a particular client in the same way.'  Rare are the situations

in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any

one technique or approach."  *Id.*  at 788-89 (quoting from *Strickland*, 466 U.S. at 689).   As a

result, counsel's performance does not fall below that guaranteed by the Sixth Amendment where

it can be shown that counsel formulated a strategy that was reasonable at the time and balanced

limited resources with effective trial tactics and strategies.  *Harrington*, 131 S.Ct.  at 789.  "Just

as there is no expectation that competent counsel will be a flawless strategist or tactician, an

attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to

prepare for what appear to be remote possibilities." *Harrington*, 131 S.Ct. at 791. Moreover, "it

is difficult to establish ineffective assistance when counsel's *overall* performance indicates active

and capable advocacy." *Harrington*, 131 S.Ct. at 791 (emphasis added). Finally, in considering

the prejudice prong of *Strickland*, the likelihood of a different result must be substantial, not just

conceivable. *Id.* at 791-792 (Citations omitted). As a result, "'[s]urmounting *Strickland's* high

bar is never an easy task.'" (quoting from *Padilla v. Kentucky*, 559 U.S. ___, ___, 130 S.Ct.

1473, 1485 (2010)). In part, because:

> Unlike a later reviewing court, the attorney observed the relevant proceedings,
> knew of materials outside the record, and interacted with the client, with opposing
> counsel, and with the judge. It is "all too tempting" to "second-guess counsel's
> assistance after conviction or adverse sentence." The question is whether an
> attorney's representation amounted to incompetence under "prevailing
> professional norms," not whether it deviated from best practices or most common
> custom.

*Harrington*, 131 S.Ct. at 778 (citations omitted).

With respect to the specific examples of ineffective assistance of counsel which Percel

cites to in support of this ineffectiveness claims, such as that counsel failed to convey an offer of

48 months imprisonment, that counsel failed to interview co-defendants, failed to explain to him

the effect of the Guidelines and how they would be used to calculate his sentence, failed to advise

him about U.S.S.G. § 2D1.1(b)(6) and § 5C1.2, which could have reduced his sentence by two

levels, failed to object to improper jury instructions, and failed to advise him of the repercussions

of testifying should the jury not find him credible, the record either affirmatively shows that

Percel's counsel was not deficient or there is no evidence that the alleged errors prejudiced Percel

within the meaning of *Strickland*.

With respect to counsel's failure to convey an offer by the Government of a term of

imprisonment of 48 months,  the undersigned Magistrate Judge takes judicial notice that Federal

Rule of Criminal Procedure 11(c)(1)(C) agreements that bind the sentencing judge to a particular

sentence are not accepted by the District Judges in the Southern District of Texas, Houston

Division.  Sentencing determinations are the sole province of the District Judge, following

preparation of a PSR.  Indeed, Defendants who plead guilty are advised at their Rearraignment

Hearing that their sentence cannot be determined at the time a plea is entered.  For example, at

the Rearraignment Hearing of the two co-defendants he relies on in support of his § 2255 motion,

German Arias and Bonifacio Hernandez on June 30, 2006, show that their sentences were

unknown at the time of their Rearraignment Hearing.  During their plea colloquy, Judge Harmon

stated:

> The Court: All right.  Do you understand that your written plea agreeement will be
> binding upon you and upon the government, but it's not binding upon me?  So, it
> could be that the government makes a motion or recommendation to me in order
> to fulfill its end of the bargain, its part of the plea agreement, but I don't have to
> grant that motion or follow that recommendation.  Do you understand that?
>
> *                              *                              *
>
> The Court: And if I don't follow that recommendation or grant that motion, it
> could be that you would get a sentence that is more severe than the one that you
> would otherwise get.  Do you understand that?
>
> *                              *                              *
>
> The Court: All right.  And that means that a probation officer will be ordered to
> conduct an investigation of your case and to write a presentence report that will
> assist me in sentencing. ...
>
> *                              *                              *
>
> The Court: All right.  And for that reason I will not be able to tell you what your
> sentence is today...

\*                    \*                    \*

The Court: All right.  Once the probation officer has written the presentence report, you and your attorney will get a copy of that report and the government will also get a copy of that report.  And each of you will be given an opportunity to make objections to that presentence report.  We will then have a sentencing hearing.  At that hearing I will rule on any objections that may be made to the presentence report.  I will also rule on any motions that may be made, any recommendations that may be made, or any other matters that might be brought to my attention that might have an impact on the kind of sentence that you receive.  Do you understand that....

\*                    \*                    \*

The Court: And at the conclusion of that sentencing hearing, I will then be in a position to determine what your sentence will be.  And when I pronounce sentence, it may be that the sentence I give you is more severe than the one that you and your attorney may have estimated you might get when you were discussing how the guidelines might apply in your case....(Document No.  353, Transcript of Rearraignment Hearing, pp.  11, 12, 16, 17).

Similarly, German Arias' written plea agreement states in pertinent part about his sentence:

14.  Defendant is aware that the sentence will be imposed after consideration of the USSG, which are only advisory, as well as the provisions of 18 U.S.C. § 3553(a).  Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable USSG.  Defendant understands and agrees the parties' positions regarding the application of the USSG do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge.  If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this agreement.  (Document No.  109, p.  6).

The docket sheet further shows that nearly eight months passed before Arias was sentenced.

Therefore, regardless of whether there had been an overture by either  Percel's counsel or the

Government about a possible plea, such negotiations could not and would not have included a particular sentence since sentences in this district are not known until sentencing. To the extent that counsel recalled an offer by the Government of a 48 month sentence, this was more likely than not discussed in the context of a sentencing recommendation that possibly could be made by the Government should the Government elect to file a Motion for Downward Departure under U.S.S.G. § 5K1.1.

As to general plea negotiations, even assuming that conversations had taken place between Percel's counsel and the Government, and assuming further that counsel could have and should have discussed the nature of the conversations with Percel, upon this record, Percel has not shown that he expressed, explicitly or implicitly, any interest in pleading guilty, accepting responsibility, and fully cooperating with the Government. The record shows that Percel has maintained his innocence both in the underlying criminal proceedings and through the instant federal habeas proceeding. At trial, Percel unequivocally denied any knowledge of or involvement in the charged drug trafficking activities. The Fifth Circuit summarized Percel's testimony as follows:

> Percel testified on his own behalf, while Vasquez declined to testify. Percel claimed that he was in Houston with a friend to visit the friend's relatives. Percel testified that he believed he was going to a party with Vasquez and Hernandez at the Alejo house. According to Percel, he never went into the kitchen or the garage of the house, never saw any cocaine, and never saw the minivan at the Alejo house. Instead, he remained in the living room, where he watched TV, played dominoes, and drank some beer. He also denied involvement in the cocaine transaction

Likewise, other than his conclusory allegations that he would have cooperated and accepted responsibility in order to potentially shorten his advisory guideline sentence, the gist of his

§ 2255 Motion and Memorandum in Support, is Percel's denial of any involvement in or knowledge of the drug trafficking activities.   Moreover, he has corroborated his protestations of innocence with affidavits of two co-defendants, Bonifacio Hernandez and German Arias, in which both state that Percel was not involved in any illegal activities.   Given his unequivocal trial testimony and statements in his § 2255 Motion and Memorandum in Support that he was not aware of any criminal activities and was not involved in any of the activities charged in the Indictment, Percel conclusional statements concerning his willingness to plead guilty are controverted by the record.

Next, Percel claims that his counsel was ineffective for failing to advise him as to the effect of the Sentencing Guidelines and how the Guidelines would be used to calculate his sentence.   According to Percel, the failure by counsel to inform him about the Guidelines rendered his "plea involuntary."   In addition, he alleges that counsel failed to inform him about how the amount of drugs could be used to calculate his sentence, and the possibility of benefitting from the "safety valve" and receiving a downward departure under U.S.S.G. § 5K1.1.   As discussed above, even assuming that counsel could have and should have explained the advisory sentencing guidelines, Percel has not shown that his decision to proceed to trial was not voluntary and based on his desire to be acquitted.   Other than Percel's conclusional allegations that he would have been interested in possible sentencing reductions, his actions in the underlying criminal proceeding and in this § 2255 motion controvert  his allegations regarding the sentencing guidelines.   With respect to drug quantity, Percel argues that he was not aware that all the drugs attributable to the conspiracy would be used to calculate his relevant conduct.   The record shows that Percel was held accountable for the sale and negotiation of 34.8

kilograms of cocaine, which included the 9.9 kilograms of cocaine seized in the mini-van driven by Osorio and Arias and the 24.9 kilograms of cocaine seized from 8915 Alejo, Houston, Texas. Percel has not identified any argument that counsel could have or should have made with respect to this calculation or how this impacted his decision to proceed to trial.  To the extent Percel suggests that this amount includes an earlier cocaine transaction that Arias testified about, that amount was not charged and was not included in this calculation.

As to Percel's remaining allegations relating to possible sentencing benefits for accepting responsibility or for cooperating with the Government, the sentencing guidelines are advisory and are only a starting point in calculating a sentence and it would be speculative to presume that a particular sentence would be imposed by the court.  Because the sentencing guidelines are advisory, the Court was not even required to impose a sentence within the suggested guideline range.   To the extent that Percel suggests that he would have received a two level adjustment for acceptance of responsibility, the entering of a guilty plea does not automatically guarantee acceptance of responsibility sentencing reduction under U.S.S.G. § 3E1.1, Application note 3 ("A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.").  Even assuming that Percel received a two level reduction, his advisory sentencing range would have been 121-151 months, in contrast to 151-188 months.  Judge Harmon sentenced Percel to 151 months.  Under either calculation, Percel had a possible sentence of 151 months.  Here, Judge Harmon found a sentence of 151 months appropriate and commented on Percel's involvement in a multi-kilogram cocaine trafficking conspiracy, that it was his second arrest in the Southern District of Texas for drug activities and the had no ties to the Southern District of Texas, and that there were many unanswered questions about his

background such as his work, residence, financial history, use of aliases, and travel between

states that are not close geographically (Wisconsin, Massachusetts, and Texas).  In *United States*

*v. Dockery*, 423 Fed. Appx.  487 (5th Cir.  2011), 2011 WL 1659874, *(pet.  cert filed.*  July 201,

2011), the Fifth Circuit issued a certificate of appealability on the issue of whether a failure by

counsel to explain the operation of the Sentencing Guidelines, including the possibility of a

reduced sentence for acceptance of responsibility, rendered Dockery's decision to proceed to trial

rather than plead guilty uninformed.  The Fifth Circuit concluded that it had not because

Defendant Dockery could not show prejudice given the record which conclusively showed that it

was not reasonably *probable* that he would have received a shorter sentence had he pleaded

guilty.  The implication from *Dockery* suggests the same result would be true in the instant action

where Percel has not shown that it was reasonably probable that he would have received a

sentence shorter had he pleaded guilty and received a two level reduction for acceptance of

responsibility given Judge Harmon's statements at his sentencing and that under either advisory

guideline calculation he had a 151 month term of imprisonment.

 As to sentencing reductions based on U.S.S.G. § 5K1.1, such motions are predicated on a

defendant's cooperation, and the filling of the motions cannot be compelled.  The motions are

filed at the discretion of the Government, following their assessment of the usefulness of a

defendant's assistance during the government's prosecution of a case.

In addition, the record shows that Percel was aware of the sentencing advantages for

cooperating with the Government.  The two testifying co-defendants were thoroughly cross

examined by Percel's counsel concerning their motivation for testifying at trial, namely the

possibility of shortening their sentences.  Percel's ineffective assistance of counsel claims

relating to the Guidelines fail.

With respect to Percel's claim that his counsel failed to interview co-defendant Bonifacio Hernandez and German Arias, other than conclusional allegations that counsel could have and should have interviewed Arias and Hernandez, Percel has not disclosed with specificity what such interviews would have produced.  Both Bonifacio Herndandez and German Arias have belatedly come forward after the conclusion of the underlying criminal proceeding, and with respect to German Arias, following completion of his prison sentence and deportation, with affidavits in support of Percel and his claim that he was not involved in any drug trafficking activities.  With respect to Bonifacio Hernandez's affidavit, this is not the first time that Percel has relied on the affidavit of Bonifacio Hernandez.  Indeed, the same affidavit was submitted in connection with his motion for a new trial.  The Fifth Circuit affirmed the Court's denial of Percel's Motion for New Trial.  The Fifth Circuit concluded that even if Bonifacio Hernandez had testified that Percel did not participate in the offense and had no knowledge of the cocaine, this testimony would not likely resulted in an acquittal at a new trial given the strength of the evidence against him.  The Fifth Circuit wrote:

> Two of Percel's co-defendants offered detailed testimony at trial implicating him
> in the offense.  That testimony was corroborated to a large extent by testimony
> from DEA agents who conducted surveillance of the defendants on the day of
> their arrest; by video tapes made during that surveillance; and by items found
> during searches of the residence involved.

Even assuming that Bonifacio Hernandez would have agreed to be interviewed by Percel's counsel, Percel has not shown that he was prejudiced by the failure of counsel to interview Bonifacio Hernandez given the strength of evidence which implicated Percel in the offense.

Likewise, other than Percel's conclusional allegation that counsel could have and should

have interviewed German Arias, Percel has not shown that at the time of trial, German Arias, who had pleaded guilty and was cooperating with the Government, and whose cooperation was fully known by counsel, would have provided substantial assistance to Percel. The record shows that German Arias testified at trial. His testimony affirmatively linked Percel to the drug trafficking activities charged in the Indictment. Arias also testified about an earlier trip to Houston in the fall of 2005 that involved the purchase of cocaine. The record shows that German Arias was thoroughly cross examined by Percel's counsel about his plea agreement and motivation for testifying against Percel, namely a sentencing reduction. (Document No. 385, p. 364). Arias testified in specific detail about his life-long friendship with Percel since the age of seven and about Percel's role in the drug trafficking activities alleged in the Indictment and about the earlier trip to Houston. (Document No. 385, pp. 339, 343, 347, 349-351, 353, 354, 357). It is only after completion of his sentence that Arias has come forward to offer allegedly exculpatory evidence. The record is absent any indication that German Arias was coerced into cooperating with the Government or that he had information that was exculpatory during the underlying criminal proceedings. Affidavits from witnesses who attempt to recant testimony are viewed with "extreme suspicion." *Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005). Moreover, even accepting as true that Arias had such exculpatory evidence as described in his affidavit, and would recant his testimony, even without his testimony, the evidence of guilt was strong against Percel. As the Fifth Circuit noted with respect to belated affidavit of Bonifacio Hernandez, there was corroborating evidence of another co-defendant, Baldomero De Leon, along with testimony of the agents participating in the surveillance on the day in question, video tapes of the surveillance, and the results of searches conducted at residences and vehicles.

30

According to the Fifth Circuit, Baldomero DeLeon testified as follows:

> DeLeon testified that he sold thirty-five kilograms of cocaine to Osorio and
> Hernandez, who in turn sold it to Percel, Vasquez, and Arias.  According to
> DeLeon, on the night in question, he and Escobar brought the cocaine from 7430
> Weatherhill to 8915 Alejo, where everyone, including Percel and Vasquez, helped
> package the cocaine.  DeLeon also stated that Vasquez, Percel, and Arias
> concealed the cocaine in the minivan when it was brought into the garage.

Again, even without the testimony of Arias or Herdandez, there was sufficient evidence to

support the conviction.  Upon this record, Percel has not shown that counsel fell below the

*Strikland* standard in his failure to interview German Arias or Bonifacio Hernandez.

Percel next alleges that his counsel was constitutionally ineffective in failing to object to

the improper jury instructions that were read to the jury.  According to Percel, the jury

instructions, as read, were improper because the Court left out a word.  Percel contends he was

prejudiced by counsel's failure to object because the jury was allowed to draw an inference on

his Fifth Amendment right of silence.  Upon this record, Percel has not shown that counsel's

performance fell below that of *Strickland*.  Percel testified at trial and in doing so he did not

invoke his Fifth Amendment right of silence.  It is undisputed that the jury instruction that was

read by Judge Harmon left out the word "not" but that the actual written instructions that were

given to the jurors for their deliberations were correct.  The record further shows that this issue

was raised on appeal and that the Fifth Circuit Court of Appeals found that Percel was not

prejudiced by the Court's oral misstatement.  This Court is not in a position to revisit an issue

that has been decided on appeal in a § 2255 motion.  *United States v.  Kalish*, 780 F.2d 506, 508

(5th Cir.  1986) ("It is well settled in this Circuit that issues raised and disposed of in a previous

appeal from an original of conviction are not considered in § 2255 motion.").  Given that written

instructions that were given to the jury were correct, Percel has not shown he was prejudiced by the Court's omission of a word when orally reading the jury instructions. Any objection that could have and should have been made by counsel by the omission of "not" when the jury instructions were read aloud, were corrected a short while later when the jury retired to the jury room for deliberations with the written jury instructions. This claim fails.

Finally, to the extent that Percel claims counsel was ineffective because he did not explain to him the risks of testifying on his own behalf, including the possibility that the jury might not believe his testimony, even assuming that counsel failed to explain this, the record shows that prior to testifying, Percel, swore under oath, to testify truthfully. Percel wanted to testify and exercised his right to do so. The jury was instructed about assessing witness credibility. To the extent the jury disbelieved Percel's version of events, the jury's determination does not support a claim of ineffective assistance of counsel.

Lastly, to the extent that Percel claims that he was prejudiced by the cumulative impact of trial counsel's errors and as a result he was denied due process, given that none of his allegations were meritorious, he cannot show he was prejudiced by counsel's alleged failures. There has been no showing by Percel of ineffective assistance of counsel by Mr. Lopez de Victoria. Because Percel has not shown that counsel's performance amounted to incompetence under prevailing professional norms, all of his ineffective assistance of counsel claims fail under *Strickland*. "Counsel's overall performance indicates active and capable advocacy." *Harrington*, 131 S.Ct. at 791.

### III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss (Document No.  522) be

GRANTED, and that Movant Eric Vasquez's § 2255 Motion to Vacate, Set Aside or Correct

Sentence (Document No.  497) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented

parties of record.  Within 14 days after being served with a copy, any party may file written

objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed. R. Civ. P. 72(b), and General Order 80-5,

S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from

attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694

F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404

(5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the 14

day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v.*

*United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any

written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston,

Texas 77208.

Signed at Houston, Texas, this 26th day of September, 2011.

Frances H. Stacy
United States Magistrate Judge

33